RICHARD A. AND ALICE D. CRAMER, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE RESPONDENT

Docket Nos. 27682–90, 27684–90, Filed September 22, 1993.
29100–90.

[1] Cases of the following petitioners are consolidated herewith: Warren K. and Susi M. Boynton, docket No. 27684–90; and Kevin P. and Dina E. Monaghan, docket No. 29100–90.

*William P. Shannahan, Robert K. Smith, Robert F. Dailey, Seth Throop Karpinski,* and *Brookes D. Billman, Jr.,* for petitioners in all cases.

*Michael Ira Saltzman,* for petitioners in docket Nos. 27682-90 and 27684-90.

*William H. Quealy, Jr., Alice M. Harbutte, Thomas A. Dombrowski,* and *Valerie N. Larson,* for respondent.

COHEN, *Judge:* In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows:

*Richard A. and Alice D. Cramer*
*Docket No. 27682-90*

|  |  | *Additions to tax* | | |
|  |  | *Sec. 6653(a)(1)* | *Sec. 6653(a)(2)* | |
| *Year* | *Deficiency* | | | *Sec. 6661* |
| 1982 | $7,802,334 | $390,117 | [1] | $1,950,584 |

[1] 50 percent of the interest due on $7,802,334.

*Warren K. and Susi M. Boynton*
*Docket No. 27684-90*

Additions to tax

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|
| 1982 | $2,314,440 | $115,722 | [1] | $578,610 |

[1] 50 percent of the interest due on $2,314,440.

*Kevin P. and Dina E. Monaghan*
*Docket No. 29100-90*

Additions to tax

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|
| 1979 | $4,147 | - - - | - - - | - - - |
| 1982 | 619,317 | $30,966 | [1] | $154,829 |

[1] 50 percent of the interest due on $619,317.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues presented for decision are:

(1) Whether proceeds received by petitioners in 1982 from the sale of certain options granted in 1978, 1979, and 1981 constituted ordinary income or long-term capital gains;

(2) whether Richard A. and Alice D. Cramer (the Cramers) are entitled to exclude $1.3 million of the proceeds received by them from the sale of such options from their income for 1982;

(3) whether petitioners are liable for additions to tax under section 6653(a) for 1982 for underpayments resulting from characterizing the proceeds from the sale of such options as long-term capital gains instead of as ordinary income;

(4) whether petitioners are liable for additions to tax under section 6661 for 1982; and

(5) whether additions to tax under section 6653(a) may be cumulatively assessed with additions to tax under section 6661.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

At the time of the filing of the petitions, petitioners resided in California.

Petitioner Richard A. Cramer (Cramer) founded IMED Corp. (IMED), a company engaged in the design, manufacture, and sale of electronic medical instruments, primarily a device known as an "infusion pump" and related disposable devices. From 1972 through August 1982, Cramer was a shareholder, the president, and chief executive officer of IMED.

From 1972 through August 1982, petitioner Warren K. Boynton (Boynton) was vice president of IMED. Boynton was on the board from 1972 through October 1973 and from December 1974 through August 1982.

Petitioner Kevin P. Monaghan (Monaghan) served as outside general counsel to IMED from its inception in 1972 until August 1982. From August 1975 through August 1982, Monaghan was assistant secretary of the board of directors of IMED (the board). Monaghan, an attorney admitted to practice in California, was a member of the firm of Hahn, Cazier & Leff from 1979 through 1982. Petitioners Cramer, Boynton, and Monaghan were close friends as well as business associates.

From 1978 through 1981, the stock of IMED was neither publicly traded on an established stock market exchange nor registered with the Securities and Exchange Commission. As of July 7, 1978, there were 571,045 issued and outstanding shares of IMED common stock and 10,000 issued and outstanding voting shares of IMED preferred stock. On September 26, 1978, IMED effected a 3-for-1 stock split (the stock split) of its outstanding common and preferred stock. As of October 18, 1979, there were 2,061,884 issued and outstanding shares of IMED common stock. According to the shareholder lists of IMED, from 1978 to 1981, the stock of IMED was held by no less than approximately 150 shareholders and no more than approximately 255 shareholders.

On September 26, 1977, the board authorized the grant to Cramer of an option (the Cramer 1978 option) for the purchase of 50,000 shares of IMED common stock at $50 per share.

On May 24, 1978, IMED filed a permit application, prepared by Monaghan, with the California Department of Corporations (the department of corporations) with respect to the proposed issuance of the Cramer 1978 option. In the application, IMED represented that the option contained "special vesting provisions under which the option 'vests' in Mr. Cramer at the rate of 20% (10,000 shares) per year, so that it is not fully vested for five years, with the vesting subject to termination in the event that Mr. Cramer voluntarily resigns as an officer of Applicant." In a letter dated June 7, 1978, to the department of corporations regarding the above application, Monaghan represented that the proposed option contained a 5-year vesting provision. In a letter dated June 19, 1978, Monaghan represented to the department of corporations regarding the Cramer 1978 option that "there is *no* benefit to the optionee in the event the option does not vest. Vesting occurs as a function of time and continued employment."

A notice of annual meeting of shareholders, dated June 14, 1978, that was sent to the shareholders of IMED stated that one of the purposes of the July 7, 1978, shareholders meeting was to authorize the issuance to Cramer of the Cramer 1978 option. A proxy solicitation dated June 14, 1978, was sent to the IMED shareholders in connection with the July 7, 1978, shareholders meeting soliciting votes in favor of the issuance of the Cramer 1978 option. The proxy statement stated that the board had approved a special stock option to be issued to Cramer "In recognition of the foregoing and other services rendered to the Company by Mr. Cramer, and as an incentive for Mr. Cramer's continued involvement with the Company." It further represented that "The option would 'vest' in Mr. Cramer at the rate of 20% (10,000 shares) per year for five years, so long as he had not voluntarily resigned as an officer of the Company prior to the end of each such 'vesting' year."

The Cramer 1978 option was delivered to Cramer on or about September 1, 1978. The Cramer 1978 option was increased to 150,000 shares as a result of the stock split.

The Cramer 1978 option stated: "Cramer may exercise this Option in 20% increments through the fifth year-end anniversary hereof, so long as he is, at such anniversary

date, still an employee of IMED." The Cramer 1978 option contained the following vesting schedule:

| Percentage of shares underlying the option that may be exercised | Earliest date upon which Cramer may exercise | Last date upon which Cramer may exercise |
|---|---|---|
| 20% | June 30, 1979 | June 30, 1988 |
| 40 | June 30, 1980 | June 30, 1988 |
| 60 | June 30, 1981 | June 30, 1988 |
| 80 | June 30, 1982 | June 30, 1988 |
| 100 | June 30, 1983 | June 30, 1988 |

The option stated that "The intent of the vesting provisions and restrictions * * * is to provide an inducement to Cramer to remain as an employee of IMED for a period of five years and to not voluntarily resign within that period." The Cramer 1978 option also provided that its transferability was subject to the vesting provisions and limited the persons to whom Cramer could transfer or assign all or a portion of the option to persons approved by the board as "qualified offerees". The approval of the board was stated to be contingent on the receipt of a favorable opinion of counsel and could be refused if the transfer would require registration under section 5 of the Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. sec. 77a (1988).

Cramer was also granted an option dated August 30, 1979, to purchase 4,390 shares of IMED common stock at $8 per share (the Cramer 1979 option). The Cramer 1979 option, like the Cramer 1978 option, provided that the optionee could exercise the option "in 20% increments through the fifth year-end anniversary hereof, so long as he is, at such anniversary date, still an employee or consultant to IMED". The Cramer 1979 option contained the following vesting schedule:

| Percentage of shares underlying the option that may be exercised | Earliest date upon which options may exercise | Last date upon which optionee may exercise |
|---|---|---|
| 20% | Dec. 31, 1979 | Dec. 31, 1985 |
| 40 | Dec. 31, 1980 | Dec. 31, 1985 |
| 60 | Dec. 31, 1981 | Dec. 31, 1985 |
| 80 | Dec. 31, 1982 | Dec. 31, 1985 |
| 100 | Dec. 31, 1983 | Dec. 31, 1985 |

The Cramer 1979 option contained the same transfer restrictions as the Cramer 1978 option.

Boynton was granted an option dated August 17, 1979, for the purchase of 30,000 shares of IMED stock at $13 per share (the Boynton 1979 option). The Boynton 1979 option contained the same vesting provision as the Cramer 1979 option and the following vesting schedule:

| Percentage of shares underlying the option that may be exercised | Earliest date upon which optionee may exercise | Last date upon which optionee may exercise |
| --- | --- | --- |
| 20% | Dec. 31, 1979 | June 30, 1984 |
| 40 | Dec. 31, 1980 | June 30, 1984 |
| 60 | Dec. 31, 1981 | June 30, 1984 |
| 80 | Dec. 31, 1982 | June 30, 1984 |
| 100 | Dec. 31, 1983 | June 30, 1984 |

The Boynton 1979 option contained the same transfer restrictions as the Cramer 1978 option.

Monaghan was granted an option dated August 17, 1979, for the purchase of 4,500 shares of IMED common stock at $13 per share (the Monaghan 1979 option). The Monaghan 1979 option contained the same vesting restrictions as the Cramer and Boynton 1979 options and the following vesting schedule:

| Percentage of shares underlying the option that may be exercised | Earliest date upon which optionee may exercise | Last date upon which optionee may exercise |
| --- | --- | --- |
| 20% | Dec. 31, 1979 | June 30, 1984 |
| 40 | Dec. 31, 1980 | June 30, 1984 |
| 60 | Dec. 31, 1981 | June 30, 1984 |
| 80 | Dec. 31, 1982 | June 30, 1984 |
| 100 | Dec. 31, 1983 | June 30, 1984 |

The Monaghan 1979 option contained the same transfer restrictions as the Cramer 1978 option.

On the advice of Monaghan, a stock option trust agreement (the trust agreement), prepared by Monaghan and dated as of May 29, 1981, was executed by Cramer for IMED and for IMED International Corp. (International) and by a representative of Privaco Trust Services S.A., as trustee. The bene-

ficiaries named in the trust agreement included Cramer, Boynton, Monaghan, and the other directors of IMED.

An option to purchase paired shares of IMED Corp. and IMED International Corp. (option to purchase paired shares), prepared by Monaghan and dated June 1, 1981, for 325,000 paired shares of common stock in IMED and International (225,000 at $100 per paired share and 100,000 at $200 per paired share) was granted to the trustee (the 1981 options). The 1981 options were contributed to the trust created under the trust agreement. The 1981 options were allocated to petitioners as follows:

| Name | Number of paired shares | Exercise price |
|---|---|---|
| Cramer | 50,000 | $100 |
| | 100,000 | 200 |
| Boynton | 50,000 | 100 |
| Monaghan | 25,000 | 100 |

The 1981 options that were granted on behalf of Cramer, Boynton, and Monaghan will be referred to as the Cramer 1981-100 option (exercise price of $100), the Cramer 1981-200 option (exercise price of $200), the Boynton 1981 option, and the Monaghan 1981 option.

The 1981 options were the only asset of the trust. The sole responsibility of the trustee was to hold the 1981 options and exercise them when directed to do so by Societe Auxiliaire de Financement S.A., an agent of Cramer, Boynton, and Monaghan. The option to purchase paired shares provided that the trustee could not transfer the 1981 options except to a beneficiary. The trust agreement stated that all of the named beneficiaries had entered into an agreement entitled "Agreement Among Beneficiaries" that set forth "certain conditions under which all or a portion of their allocable share of the stock option may be cancelled".

An agreement among beneficiaries dated as of May 29, 1981, was executed by Cramer, Boynton, Monaghan, and the other beneficiaries of the trust agreement. The agreement among beneficiaries provided that the 1981 options were subject to vesting provisions "designed to assure that each Beneficiary will remain a director or officer of, or a consultant to, IMED or International for a specified period". According to the option to purchase paired shares and the agreement among

beneficiaries, the vesting schedule for the 1981 options was as follows: The 1981 options could not be exercised at all until July 31, 1983; they could not be exercised in full until July 31, 1985; and they could not be exercised during the interim period unless, at the time of exercise, the beneficiary was vested as to the portion of the option exercised on his behalf. Each beneficiary was to be deemed vested as to one-third of the number of shares of the 1981 options allocated to him for each full year of service as a director or officer of, or a consultant to, IMED or International commencing as of July 31, 1983. The agreement further provided that each of the beneficiaries could be divested of "some or all of his allocable share of the Option" if his status were to be voluntarily or involuntarily terminated.

The 1978, 1979, and 1981 options (collectively the IMED options) were drafted by Monaghan and were granted to petitioners in connection with the performance of personal services for IMED. None of the IMED options were traded on any registered exchange. None of the IMED options were ever exercised by petitioners.

Dan R. Hendrickson (Hendrickson) was hired as a corporate controller of IMED on March 8, 1976, and became treasurer of IMED on February 14, 1978. In 1978, Hendrickson consulted with William Kimbrough Rutledge, Jr. (Rutledge), an accountant with Arthur Young & Co. (Arthur Young) assigned to the IMED account, regarding the tax treatment of IMED stock options. Rutledge researched and conveyed his conclusion to Hendrickson that elections could be filed under section 83(b) for "nonstatutory options" to include such options in income at the time of grant and receive capital gains treatment upon later disposition of the options. Rutledge did not review any of the IMED options before rendering this advice.

Hendrickson advised Cramer, Boynton, and Monaghan that, in order to have a chance of getting capital gain treatment upon disposition of the options, they should file elections with the Internal Revenue Service (IRS) under section 83(b) and take the value of the IMED options into income at the time of grant. Hendrickson also communicated to Cramer, Boynton, and Monaghan that he did not believe that the value of the options could be readily ascertained and that therefore, under the Treasury regulations, the IRS could take

a position adverse to petitioners' treatment of the income from the options as long-term capital gains. Hendrickson further informed petitioners that acting contrary to or overturning a regulation "is very difficult".

In an attempt to ensure capital gain treatment upon disposition of the IMED options, petitioners filed with the IRS "section 83(b) elections" with respect to the grants of the Cramer 1978 option, the Boynton 1979 option, and the Monaghan 1979 option. The elections each stated that the fair market value of each option at the date of grant was zero. The elections were not filed with respect to the Cramer 1979 option or the 1981 options. Petitioners reported no taxable income with respect to the grants of IMED options on their tax returns for the years in which the options were granted.

Cramer believed that the options had a value greater than zero at the time the options were granted and when he filed his section 83(b) election. Boynton believed that the options had value but did not have a "readily recognizable value" at the time they were granted and at the time he filed his section 83(b) election. No experts on options or valuation of options were consulted in determining that the options had no value.

Monaghan, Hendrickson, and Rutledge failed to keep any written notes or memoranda regarding their research, or supporting petitioners' positions, with respect to section 83 and the IMED options. Petitioners did not attempt to obtain a written opinion from anyone regarding tax treatment of the IMED options.

In 1980, John Stine (Stine) became a tax principal at Arthur Young and took over the handling of the tax aspects of IMED. Stine had limited contact with Cramer and had no contact with Boynton. A note to the IMED tax file at Arthur Young that was written by Stine and dated January 16, 1981, stated that "some question exists that Section 83 applies" in situations where options were issued to employees of IMED. Notes that were recorded by Stine and dated February 5, 1981, indicated that petitioners had inquired whether the period of limitations on their treatment of the IMED options would run from the time of the section 83(b) elections. According to his notes, Stine determined that it

would not. In a letter dated October 28, 1981, that was sent to Hendrickson and Monaghan, Stine stated that

IMED currently takes the position that its stock options are governed by Section 83 and therefore the present tax treatment is * * * no income to the employee on grant or exercise and no compensation deduction to IMED. However, Regulation 1.83-7 states that an option must have a "readily ascertainable fair market value" before Section 83 will apply. Since the definition of "readily ascertainable fair market value" is virtually impossible to meet, IMED's present position is subject to challenge. * * *

Stine suggested that IMED consider the new option rules relating to incentive stock options "in light of the potential exposure to exercising employees should the Internal Revenue Service be successful in asserting the nonapplication of Section 83". Monaghan discussed the Stine letter with Cramer.

In the latter part of 1981, the management of the Warner-Lambert Corp. (Warner-Lambert) approached the officers and directors of IMED to propose a transaction whereby Warner-Lambert would acquire all of the outstanding stock of IMED and International. On July 8, 1982, petitioners terminated the trust agreement. In August 1982, Warner-Lambert purchased all of the outstanding stock of IMED for approximately $163 per paired share of stock in IMED and International. Under the agreement between IMED and Warner-Lambert, the officers and directors of IMED, including Cramer, Boynton, and Monaghan, resigned as of the date of acquisition of IMED. As part of its negotiated offer to acquire all of the outstanding stock of IMED and International, Warner-Lambert agreed to purchase all of the outstanding vested and nonvested options to acquire the stock of IMED and International. Petitioners were paid approximately $163 less the option exercise price for each option to purchase shares of stock in IMED and International.

Cramer received $22,071,000 from the sale of the Cramer 1978 option, $684,006 from the sale of the Cramer 1979 option, and $3,190,500 from the sale of the Cramer 1981-100 options to Warner-Lambert. No consideration was paid to Cramer for his 1981-200 options. Boynton received $4,524,300 from the sale of the Boynton 1979 option and $3,190,500 from the sale of the Boynton 1981 option to Warner-Lambert. Monaghan received $678,645 from the sale

of the Monaghan 1979 option and $1,595,250 from the sale of the Monaghan 1981 option to Warner-Lambert.

The 1982 income tax returns of the Cramers and the Monaghans, both dated August 9, 1983, were prepared under the direction of Robert W. Jassoy, Jr. (Jassoy), a California certified public accountant (C.P.A.) and attorney at the firm of Jassoy, Graff & Douglas. Jassoy was not provided with copies of the IMED options prior to preparing the 1982 tax returns for the Cramers and the Monaghans.

The Boyntons' 1982 tax return, dated April 11, 1983, was prepared under the direction of Charles Wieseler (Wieseler), a California C.P.A. Wieseler was not provided with any of the IMED options for review and, in fact, was unaware that Boynton had sold nonqualified stock options to Warner-Lambert.

The Cramers reported all but $1.3 million of their receipts from the options as long-term capital gain on their 1982 return. The sale of the Cramers' IMED options was set out on their 1982 return on a "Statement LD" titled "Stocks & Bonds", despite the inclusion of a second "Statement LD" titled "Options", and the options were misreported as having a basis of $7,535,620 and sales proceeds of $32,181,126. Cramer knew that he had no basis in the options.

Boynton and Susi M. Boynton (the Boyntons) and Monaghan and Dina E. Monaghan (the Monaghans) declared their receipts on their respective 1982 returns as long-term capital gains. The sale of the Boyntons' IMED options was listed on their 1982 return on a Schedule D as "IMED Stock" with a zero basis. The sale of the Monaghans' IMED options was set out on their 1982 return on a form "Computer D", and the options were misreported as having bases of $58,500 and $2,500,000 and sales proceeds of $737,145 and $4,095,250, respectively. Monaghan knew that he had no basis in the options.

None of petitioners' 1982 returns disclosed that the IMED options were subject to any restrictive terms or risk of forfeiture; that section 83(b) elections had been filed with respect to certain of the IMED options; that the options were not traded on any established market; or that petitioners relied on the conference committee reports on the Tax Reform Act of 1976 (the 1976 Act), Pub. L. 94-455, 90 Stat. 1520, for

their tax treatment of the receipts from the sale of the IMED options.

As a result of negotiations with IMED, and in order to be consistent with petitioners' treatment of the IMED options, Warner-Lambert did not claim tax deductions for compensation on its 1982 consolidated tax returns in relation to the payments made to petitioners for the IMED options. In doing so, Warner-Lambert relied exclusively on the representations of Monaghan and did not undertake its own investigation or analysis in order to verify the accuracy of such treatment.

After being informed that they were under audit by the IRS, the Cramers and the Monaghans filed amended tax returns for 1982 in July 1985, declaring a zero basis and corrected sales proceeds for the IMED options sold by them. The bottom-line gains reported on the amended returns were the same as on the original returns.

### ULTIMATE FINDINGS OF FACT

As of the dates the IMED options were granted, they did not have readily ascertainable fair market values.

Petitioners knew that the IMED options did not have fair market values of zero at the time they filed section 83(b) elections reporting zero values for the options.

At the time they filed their 1982 returns, petitioners knew that their positions with respect to the proceeds from the sale of the IMED options were subject to challenge by the IRS.

Petitioners misrepresented the sale of the IMED options on their 1982 tax returns in a way that concealed the true nature of the transactions.

Petitioners did not rely on professional advisers and did not act in good faith in reporting the sale of the IMED options on their 1982 returns.

### OPINION

Petitioners reported the amounts received from Warner-Lambert in exchange for the IMED options on their 1982 tax returns as long-term capital gains. Respondent determined that the income realized by petitioners from the sale of the IMED options is taxable as ordinary income in the year of its disposition because section 83 does not apply to the IMED

options. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a).

Section 83 provides as follows:

SEC. 83(a). GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

(b) ELECTION TO INCLUDE IN GROSS INCOME IN YEAR OF TRANSFER.—

(1) IN GENERAL.—Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of—

(A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over

(B) the amount (if any) paid for such property.

If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

\* \* \* \* \* \* \*

(e) APPLICABILITY OF SECTION.—*This section shall not apply to—*

\* \* \* \* \* \* \*

(3) *the transfer of an option without a readily ascertainable fair market value,* \* \* \*

\* \* \* \* \* \* \*

(h) DEDUCTION BY EMPLOYER.—In the case of a transfer of property to which this section applies \* \* \*, there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to the amount included under subsection (a), (b), or (d)(2) in the gross income of the person who performed such services. Such deduction shall be allowed for the taxable year of such person in which or with which ends

the taxable year in which such amount is included in the gross income of the person who performed such services.
[Emphasis added.]

Section 1.83-7, Income Tax Regs., sets forth rules for determining the tax treatment in the case of a taxpayer who receives a "nonqualified stock option"; i.e., options to which section 421 does not apply. Sec. 1.83-7(a), Income Tax Regs. The parties agree that the IMED options were nonqualified stock options. Section 1.83-7(a), Income Tax Regs., provides that, if section 83(a) does not apply to the grant of an option because it does not have a readily ascertainable fair market value at the time of grant, "the taxpayer realizes compensation income only when the option is exercised or otherwise disposed of in an arm's-length transaction." *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 208 (1988), affd. 905 F.2d 1190 (8th Cir. 1990).

When an option is not actively traded, the regulations provide that it does not have a readily ascertainable fair market value unless the fair market value of the option can be otherwise measured with reasonable accuracy. To meet this standard, a taxpayer must show that all of the following conditions exist:

(i) The option is transferable by the optionee;
(ii) The option is exercisable immediately in full by the optionee;
(iii) The option or the property subject to the option is not subject to any restriction or condition * * * which has a significant effect upon its fair market value; and
(iv) The fair market value of the option privilege is readily ascertainable in accordance with * * * [sec. 1.83-7(b)(3), Income Tax Regs.].
[Sec. 1.83-7(b)(2), Income Tax Regs.]

An option is not "transferable" unless it can be transferred to any person other than the transferor and is not subject to substantial risk of forfeiture. Sec. 1.83-3(d), Income Tax Regs. In determining whether the value of the option privilege is readily ascertainable, it is necessary to consider: (i) Whether the value of the property subject to the option can be ascertained; (ii) the probability of any ascertainable value of such property increasing or decreasing; and (iii) the length of the period during which the option can be exercised. Sec. 1.83-7(b)(3), Income Tax Regs.

Petitioners filed section 83(b) elections for the Cramer 1978 option and for the Boynton and Monaghan 1979 options but

did not file elections for the Cramer 1979 option or for the 1981 options. In each case, in determining the proper tax treatment of the cash received upon disposition of the IMED options in 1982, the threshold issue is whether the options had readily ascertainable fair market values at the times of transfer. If not, section 83 does not apply to the options, and, under section 1.83-7(a), Income Tax Regs., the options are taxable on their disposition as compensation.

Petitioners assert three theories that the proceeds were properly reported as long-term capital gains: (1) The IMED options had readily ascertainable fair market values within the meaning of section 83(e)(3) and section 1.83-7(b)(2), Income Tax Regs; (2) petitioners irrevocably elected to value the options at the time of grant under section 83(b); or (3) section 1.83-7(b)(2), Income Tax Regs., is invalid insofar as it requires immediate exercisability in order for an option to have a readily ascertainable fair market value. Respondent argues that the options did not have "readily ascertainable" values, that section 83(b) elections are not dispositive as to the treatment of the sales proceeds for 1982, and that the regulations are valid.

The IMED options were not actively traded. Under the express provisions of the options, the Cramer 1978 option could not be exercised at all until 10 months after its grant date, the 1979 options could not be exercised at all until at least 4 months after their grant dates, and the 1981 options could not be exercised at all until almost 2 years after their grant dates. The 1978 and 1979 options also contained transfer restrictions, including transfer being subject to vesting provisions. The express vesting provisions and transfer restrictions prevent the IMED options from being transferable or "immediately exercisable" as required by section 1.83-7(b)(2), Income Tax Regs. See *Pagel, Inc. v. Commissioner, supra* at 209.

Further, the testimony of petitioners and their experts shows that the value of the IMED options was in fact not readily ascertainable when they were granted. Petitioners, who owned and ran IMED, and Hendrickson, a C.P.A. familiar with IMED, reported a zero value at the time the options were granted. At trial, Cramer and Boynton, the founders and top executives at IMED, testified that they could not determine the value of the options at the time of grant. Monaghan

claimed to believe that the options had readily ascertainable fair market values of zero when they were granted, because the option exercise prices were higher than the then prices of the underlying stock. Of course, this relationship between the exercise price and the price of the stock at the time of the grant is hardly unusual. See generally *Laureys v. Commissioner*, 92 T.C. 101, 102-104 (1989). Monaghan also testified that the purpose for granting the options was compensatory, "as a reward". In view of the opinions of Cramer and Boynton that the options had value, and because it is implausible that Monaghan believed that something with no value would serve as a "reward" to employees, Monaghan's testimony that he believed the options to have a zero value at the time of grant is not persuasive.

Petitioners now claim that the options had readily ascertainable fair market values of greater than zero at the time of grant. Petitioners presented the expert testimony of Kenneth A. Bodenstein (Bodenstein) as to the values of the options at the time they were granted. Bodenstein had no specific knowledge of IMED, but he determined a range of possible values under a formula called the "Black-Scholes" model and then used the "Shelton" and "Kassouf" models to pick out the "correct values". The Black-Scholes model was designed for publicly traded options. Thus, Bodenstein's valuation depended on estimates of the underlying stock value and the volatility of the underlying stock value. Bodenstein estimated that IMED's common stock value was "in the range of $10.00-$11.00 per share at September 1, 1978, $20.00-$22.00 per share at September 1, 1979, and $47.50-$51.50 per share at June 1, 1981." Depending upon what values were used for the unknown factors, the models came up with the following range of values for the IMED options:

| Option | Range of values |
| --- | --- |
| 1978 | $4.00 to $5.90 |
| 1979 [1] | 10.45 to 14.10 |
| 1981-100 | 15.50 to 24.45 |
| 1981-200 | 6.05 to 19.45 |

[1] This valuation applies only to the Boynton and Monaghan 1979 options.

Bodenstein determined that the Cramer 1978 option had a $4.50 per share value, the 1979 options had a $12-per-share value, the 1981-100 options had a $19-per-paired-share value, and the 1981-200 options had an $11-per-paired-share value on the respective dates of grant. Bodenstein then applied a 25-percent discount to the values for lack of marketability to determine the following values: $3.38 per share for the Cramer 1978 option, $9 per share for the Boynton and Monaghan 1979 options, $14.25 per paired share for the 1981-100 options, and $8.25 per paired share for the 1981-200 options. Bodenstein's valuations depended heavily on assumptions made with respect to unknown factors, to wit, the stock value, the discount for lack of marketability, and the volatility of the underlying stock value, based on companies determined by Bodenstein to be comparable. In addition, these valuation methods did not take into account the vesting and transfer restrictions on the IMED options. If Bodenstein's stock valuations were correct, petitioners' 1979 options would have had values at least equal to the difference between the stock value ($20 to $22 per share) and the option exercise price ($8 for Cramer and $13 for Boynton and Monaghan). Significantly, Cramer did not file an election with respect to the 1979 options. "Consistency" would have required Cramer to report ordinary income at that time.

Petitioners claim that, in valuing the options, we should overlook the express restrictions on the options because the restrictive provisions of the options were included only because the options were executed on standard forms. Through their testimony and the testimony of other board members, petitioners attempt to negate the effect of such provisions and to claim that the options could have been immediately exercised in full by them. These contentions are in direct conflict with the express provisions of the options, with the representations made to the department of corporations, and with the proxy statement that was sent to IMED shareholders. Petitioners claim that the board members would have voted to waive the restrictions on the options. However, the board members, in representing the interests of the shareholders of IMED, should only have waived such restrictions if it were in the best interests of the IMED shareholders. Further, both Monaghan and Cramer testified that paragraph 6 of the Cramer 1978 option was included specifi-

cally with respect to that option. Paragraph 6 provided that "The intent of the vesting provisions and restrictions on exercisability * * * is to provide an inducement to Cramer to remain as an employee of IMED for a period of five years and to not voluntarily resign within that period." Petitioners have not persuaded us that the restrictions are meaningless and would never have been enforced.

Petitioners argue, alternatively, that the vesting and transfer restrictions in the IMED options would have no effect on their fair market value. Bodenstein testified that the restrictive terms of the options, to wit, on vesting, transfer, and employment requirements, would not affect a potential buyer's offering price for such options. However, Rutledge testified that, if he was aware of the restrictions, they would have affected his opinion, at least as to market value. Moreover, petitioners' other expert, Steven L. Wagner (Wagner), and respondent's expert, I. Jeff Litvak (Litvak), testified that such restrictions could affect the value of the options.

Wagner stated in his report that

Valuation of non-publicly traded assets necessarily must address the degree of transferability inherent in a non-publicly traded asset. Whether the asset is a common stock, an option or a warrant, the appraiser selects a discount for lack of marketability based on the facts available as of the appraisal's valuation date.

Wagner concluded that, because "estimating the degree of transferability is a typical consideration in the valuation of assets", the requirement of transferability under section 1.83-(b)(2)(i), Income Tax Regs., does not affect "the ability of the appraiser to estimate the fair market value of the options. * * * it would appear possible to estimate the degree of transferability of the Options and reflect such, quantitatively, in their appraisal". Wagner also concluded that the options could be valued even if tied to a vesting schedule, because a valuation consultant could perform a probability analysis to estimate the likelihood of the optionees' remaining with IMED at each date, the likelihood of the optionees' surviving to that date (under normal conditions), and the likelihood that they would have sufficient funds to exercise.

The opinions of Wagner, Litvak, and Rutledge are consistent with common sense. It is implausible that an investor faced with the choice of a restricted or nonrestricted option

would pay the same for each. Cf. *Estate of Hall v. Commissioner*, 92 T.C. 312, 338-339 (1989) (expert's opinion that did not take transfer restrictions into account considered unreasonable or unreliable evidence of fair market value).

In these cases, that a valuation expert may be able to calculate a value for the options is not enough to satisfy the requirement that the value be "readily ascertainable". Bodenstein's models did not account for the effect of any restrictions on the option values. Even if an accurate value could be determined with consideration of transfer and vesting restrictions, petitioners created fatal uncertainties in their evidence of conflict between express provisions and probable effects of the restrictions and vesting schedules. Testimony of petitioners and their witnesses indicates a possibility that the vesting provisions and transfer restrictions might not be enforced. Thus, it would have been unclear to potential purchasers at the time the options were granted exactly what restrictions would apply to the options or even how many were outstanding at any particular time. Where the restrictions affecting value could not be ascertained, there could not have been a readily ascertainable fair market value, determined with reasonable accuracy, at the time the options were granted. By using the term "readily ascertainable" to modify "fair market value", Congress expressed an intent to exclude unreliable methods to value options, such as the IMED options, that were not publicly traded and contained substantial restrictions. Sec. 83(e)(3).

Petitioners argue that their section 83(b) elections were in accordance with congressional intent and warrant a finding that such options had readily ascertainable fair market values at the time they were granted. Though petitioners do not limit the scope of this argument, we presume it is applicable only to the options for which section 83(b) elections were made. Petitioners cite the conference committee report to the 1976 Act (the 1976 conference report), which stated:

The conferees intend that in applying these [restricted options] rules in the future, the Service will make every reasonable effort to determine a fair market value for an option (i.e., in cases where similar property would be valued for estate tax purposes) where the employee irrevocably elects (by reporting the option as income on his tax return or in some other manner to be specified in regulations) to have the option valued at the time

it is granted * * *. The conferees intend that the Service will promulgate regulations and rulings setting forth as specifically as possible the criteria which will be weighed in valuing an option which the employee elects to value at the time it is granted. [S. Conf. Rept. 94-1236 (1976), 1976-3 C.B. (Vol. 3) 807, 842-843.]

The 1976 conference report accompanied the 1976 legislation amending section 422 as applicable to qualified stock options granted to employees. Such legislation was subsequent to the enactment of section 83 and the release of the proposed section 83 regulations but prior to the promulgation in final form of section 1.83-7, Income Tax Regs. Petitioners assert that we should look to this "subsequent legislative history" to determine legislative intent for determining whether an option has a readily ascertainable fair market value. In the alternative, they argue that the section 83 regulations are contrary to the intent of Congress and should not be followed.

Although the taxpayers in *Pagel, Inc. v. Commissioner,* 91 T.C. 200 (1988), affd. 905 F.2d 1190 (8th Cir. 1990), did not make a section 83(b) election, the Court's analysis there, regarding the interpretation of readily ascertainable fair market value, is applicable to the cases at hand:

Our role in the constitutional scheme * * * is not to draft the law; it is solely to interpret it. Indeed, we are constrained to uphold a regulation if it has a reasonable basis in the statutory history, even though a taxpayer's challenge to the policy behind the regulation has logical force. *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472, 488 (1979); *Fulman v. United States,* 434 U.S. 528, 530 (1978). "Congress has delegated to the Commissioner, not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code. 26 U.S.C. section 7805(a)." *Bingler v. Johnson,* 394 U.S. 741, 750-751 (1969); *United States v. Correll,* 389 U.S. 299, 307 (1967). See also *National Muffler Dealers Association, Inc. v. Commissioner,* 440 U.S. at 488; *Weigl v. Commissioner,* 84 T.C. [1192] at 1214 [(1985)]. Treasury regulations are not to be rejected unless they are unreasonable and plainly inconsistent with the statute, and they should not be overruled except for weighty reasons. *Bingler v. Johnson,* 394 U.S. at 750; *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); *Weigl v. Commissioner,* 84 T.C. at 1213-1214.

The Code states only that section 83 "shall not apply to * * * the transfer of an option without a readily ascertainable fair market value." Sec. 83(e)(3). The legislative histories that accompany the enactment of section 83 provide no elaboration whatsoever on that provision. See H. Rept. 91-413, 1969-3 C.B. 200, 255, 377; S. Rept. 91-552, 1969-3 C.B. 423, 501; H. Rept. 91-782 (Conf.), 1969-3 C.B. 644, 659-660. Part 2 of the House report,

however, is a "Technical Explanation of the Bill." See 1969-3 C.B. at 340. The Technical Explanation's discussion of the provision which ultimately was enacted as section 83 includes at least two references to "existing regulations." 1969-3 C.B. at 376. Those references indicate, to us at least, that Congress likely was aware of the then-existing regulations with respect to the transfer of property in connection with the performance of services. Sections 1.61-15 and 1.421-6 were two such regulations.

Congress did not specify any changes from the regulations' treatment of whether an option transferred in connection with the performance of services had a "readily ascertainable fair market value," when it had a clear opportunity to do so. Arguably, Congress' silence in that regard may amount to a legislative enactment of the regulation provisions regarding whether options have a readily ascertainable fair market value. See *Helvering v. R.J. Reynolds Tobacco Co.*, 306 U.S. 110, 115-116 (1939); 1 J. Mertens, Law of Federal Income Taxation, sec. 3.22 (1982 rev.). In any event, Congress has not enacted any statute that contradicts the provisions of regulation sections 1.61-15 and 1.421-6, or regulations section 1.83-7, in the 25 years since such provisions first were enacted. * * * [*Pagel, Inc. v. Commissioner*, 91 T.C. at 218-220; fn. ref. omitted.]

In considering the 1976 conference report, the Court in *Pagel, Inc.* stated the following:

Commentators have suggested that Congress' statement in 1976 indicates disapproval with the regulation provisions specifying when the value of an option is "readily ascertainable." See, e.g., Billman, "nonstatutory Stock Options," 383 Tax Management A-8 (1984); Diamond & Salles, "The Receipt of Property for Services After the TRA," Tax Advisor 325, 334 (May 1988); Nolan, "Deferred Compensation and Employee Options Under the New Section 83 Regulations," 56 Taxes 790, 795-796 (1979). We, however, do not interpret that statement to express Congress' disapproval of the regulation provisions. As embodied in the regulations under sections 61 and 421 and the proposed regulations under section 83, the Treasury position has been consistent since 1961 on the issue of when an option has a readily ascertainable value. If Congress in 1976 truly disapproved of the Treasury position, it could have enacted statutory provisions and superseded the Treasury's ability to take such a position. [*Pagel, Inc. v. Commissioner*, 91 T.C. at 220.]

Petitioners argue that it is a crucial distinction that section 83(b) elections were not filed in the *Pagel, Inc.* case. We disagree. In both *Pagel, Inc.* and the instant cases, because the options did not have readily ascertainable fair market values when granted, section 83 does not apply to the options. Thus, the filing of section 83(b) elections is an irrelevant distinction.

Petitioners cite *Walt Disney Productions v. United States*, 480 F.2d 66 (9th Cir. 1973), for the proposition that the 1976

conference report, as subsequent legislative history, should be given much weight. No matter how much weight we give to the 1976 conference report, we do not interpret the language therein to mean that, if a section 83(b) election is made, an option must be treated as having a readily ascertainable fair market value. The language of section 83(e) refutes this contention. Because we find that the IMED options did not have a readily ascertainable fair market value, the report language does not help petitioners.

Petitioners further argue specifically that the "immediately exercisable" requirement of section 1.83-7(b)(2)(ii), Income Tax Regs., is invalid. Petitioners claim that excluding all options that are not immediately exercisable from the definition of "readily ascertainable fair market value" is unreasonable, inconsistent with, and an improper implementation of, congressional mandate.

Treasury regulations are not to be rejected unless they are unreasonable and plainly inconsistent with the revenue statutes. *Bingler v. Johnson,* 394 U.S. 741, 750-751 (1969). Our task has been defined as follows:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [*Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842-843 (1984); fn. refs. omitted.]

Section 83 does not contain a definition of the term "readily ascertainable fair market value". Thus, we must determine whether the inclusion of a requirement of immediate exercisability in the definition of "readily ascertainable fair market value" is a valid and permissible construction of the statute.

Petitioners argue that, although the lack of immediate exercisability may affect the value of the options, it is not so critical that its presence prevents an option from having an

"ascertainable fair market value". The failure of the formulas used by Bodenstein to take immediate exercise restrictions into account supports the contention that an option with such a restriction is harder to value. See *Pagel, Inc. v. Commissioner, supra* at 207. Whether an option is "immediately exercisable" does affect the ability to value an option at grant. Thus, we cannot conclude that the regulation presents an impermissible construction of the statute that would cause it to be invalid.

Petitioners argue that the treatment of the options was consistent and that to change the character of the proceeds received in 1982 would result in a windfall for respondent. Petitioners claim that Warner-Lambert did not take any compensation deductions in 1982 upon disposition of the options. Petitioners admit, however, that Warner-Lambert agreed to forgo deductions as a result of the negotiations between petitioners and Warner-Lambert. Petitioners are not entitled to bootstrap a nonmeritorious position by negotiating with third parties to play along with it. Determination of petitioners' correct liability is in no way a "windfall" to the Government.

Try as they might to characterize the issues in these cases as involving complex questions of law, petitioners cannot overcome the facts that scuttle their untenable positions. Petitioners ask us to hold that they qualify for capital gain treatment under the regulations, but, to do so, we must disregard the express written terms of the options. Disregard of the written terms of the options only creates more uncertainty as to the valuation of the options. Petitioners argue that congressional intent is on their side, but they sought unwarranted tax benefits, i.e., capital gain rates on the total amount of their compensation, by claiming zero fair market values, which they knew to be false, for their options for the years of grant. Further, petitioners claimed capital gain treatment for the Cramer 1979 option and the 1981 options for which no elections were made. Surely, Congress did not intend to allow taxpayers to include a fair market value of zero for compensatory property, regardless of whether the actual value could be determined, thereby to defer tax on income and ultimately to treat compensation as capital gains merely by filing an election containing baseless information. Section 83(e)(3) precludes option proceeds from

receiving capital gain treatment if the option values were not readily ascertainable at the time of grant. Because the 1978 and 1979 options had no readily ascertainable fair market values, factually and legally under section 83 and the regulations thereunder, we hold that petitioners had ordinary income in 1982 from the sale of the IMED options.

*1981 Trust*

With respect to the 1981 options, petitioners claim that the interests in the trust that were transferred to petitioners constituted "property" under section 83 and were therefore taxable to petitioners as compensation upon receipt under section 83(a). Respondent asserts that petitioners used the trust to avoid reporting the compensation from the 1981 options as ordinary income. Respondent argues that the trust was a sham with no other purpose than the avoidance of income tax and should therefore be ignored.

When the form of a transaction has not, in fact, altered any cognizable economic relationships, the courts will look through the form and apply the tax law according to the substance of a transaction. *Zmuda v. Commissioner,* 79 T.C. 714, 719-720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).

The sole property of the trust was the 1981 options. The 1981 options were granted to petitioners in consideration of their continued personal services. Although in a different form, the 1981 options contained provisions similar to those in the 1978 and 1979 options. The 1981 options did not vest for over 2 years after they were granted, contained vesting provisions over a number of years, and could be divested upon voluntary termination of employment by the optionee. Petitioners did not report the receipt of their interests in the trust in the year of transfer and declared no income upon the receipt of the interests in the trust as they had declared no income on the receipt of the 1978 and 1979 options. The trust was terminated before any vesting occurred and before the sale to Warner-Lambert. Upon the sale of IMED to Warner-Lambert, the 1981 options were treated the same as the 1978 and 1979 options and were sold for the same price.

While petitioners state in their brief that the trust had a legitimate, nontax business purpose, they do not state what that business purpose was. The only evidence in the record

that indicates a nontax purpose for the trust is Cramer's testimony that the trust was set up to keep the directors' options separate from the options of the other employees and to enhance IMED's international business relationship with the trustee. There is no plausible explanation in the record as to why such options would need to be kept separately. Further, petitioners presented no evidence that IMED would benefit from a relationship with the trustee, and Cramer testified that the 1981 options were issued in anticipation of the probable sale of the company, in which case the benefit of building a relationship with an international trustee is even less clear. Petitioners have not met their burden of proving the validity of the trust. We therefore hold that the trust should be disregarded and, for the reasons set out with respect to the 1978 and 1979 options, that the proceeds from the sale of the 1981 options received by petitioners constituted ordinary income to them in 1982.

*Cramers' Exclusion of $1.3 Million of Proceeds*

The Cramers excluded $1.3 million of the proceeds from the sale of Cramer's options to Warner-Lambert. Petitioners claim that, pursuant to an oral agreement, $1.3 million worth of the proceeds was held for certain IMED senior salespeople, who, petitioners claim, were the beneficial owners of those funds. At trial, Cramer could only remember that $400,000 was paid to one of the salespeople. Petitioners presented no other evidence of any agreement or that any payments were actually made. We cannot determine whether the alleged agreement, if it existed, was a Cramer transaction or an IMED transaction. Petitioners have failed to prove that the Cramers are entitled to exclude the $1.3 million from their income for 1982 based only on Cramer's vague and incomplete testimony.

*Section 6653(a) Additions to Tax*

Respondent determined in the notices of deficiency that the section 6653(a) additions to tax applied on the entire underpayment as to each petitioner. Petitioners bear the burden of proving that such additions to tax do not apply. Rule 142(a); *Luman v. Commissioner,* 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations. For purposes of section 6653(a), "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Neely v. Commissioner,* 85 T.C. 934, 947 (1985) (quoting *Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir. 1967)).

In limited situations, taxpayers can avoid the section 6653(a) additions to tax if they have furnished all of the relevant information to a tax preparer or other professional and relied on that person's professional advice as to the proper tax treatment. See *United States v. Boyle,* 469 U.S. 241, 251-252 (1985); *Jackson v. Commissioner,* 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); *Daugherty v. Commissioner,* 78 T.C. 623, 641 (1982); Magill v. Commissioner, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); *Pessin v. Commissioner,* 59 T.C. 473, 489 (1972).

Petitioners claim that they were not negligent because their tax positions were reasonably debatable, even if incorrect, and that the imposition of an addition to tax is inappropriate where the taxpayer has made a good faith effort to comply with law that is complex, unclear, or unsettled. Petitioners claim that they are not subject to the section 6653(a) additions to tax because they relied on advisers, key employees, and accountants for the positions that they took in reporting long-term capital gains on the proceeds from the sale of the options.

We are not persuaded. To the contrary, we agree with respondent that petitioners intentionally disregarded applicable regulations. Their claims of good faith are undermined by the evidence of what they told or did not tell their advisers and what their advisers told them.

Neither Jassoy nor Wieseler nor any of the other tax preparers purportedly relied upon by petitioners were provided with the relevant IMED options. Before preparing the 1982 returns, Jassoy was advised that elections had been filed with respect to the options and that long-term capital

gain treatment was appropriate under the advice of Arthur Young. Moreover, Cramer admitted that Jassoy had told him that his 1982 tax return position was subject to challenge.

Petitioners claim that they relied on Hendrickson. Hendrickson testified that he advised petitioners that the proposed IMED option program was contrary to the section 83 regulations and cautioned them that overturning a regulation is very difficult.

Petitioners claim that Monaghan relied on Rutledge in the decision to file section 83(b) elections. Rutledge stated that he had never seen the IMED options, that he never considered the valuation of the options, and that neither IMED nor petitioners ever engaged him to render a formal opinion on behalf of Arthur Young. He further testified that whether the options were immediately exercisable or had substantial vesting requirements are factors that would have affected the opinion as to the options' fair market value and as to whether the options had a readily ascertainable fair market value when granted. Further, Monaghan cannot rely on Rutledge's advice for tax treatment in 1978 to negate additions to tax attributable to his 1982 return.

Petitioners claim that their advisers relied on *Alves v. Commissioner,* 79 T.C. 864 (1982), affd. 734 F.2d 478 (9th Cir. 1984), in determining the tax treatment of the IMED options. Petitioners cite Judge Whitaker's dissent in *Alves* for the proposition that the Court agreed that zero income could be reported at the time of the grant of an option and that capital gains could then be reported on its sale. *Alves* involves the issue of whether section 83 applied where the taxpayer paid fair market value for stock when he received it and thus received no income when the stock was transferred to him. The issues in *Alves* bear no relation to the cases at hand where petitioners attempted to report a *fair market value* of zero on receipt of their options and where the issue is whether the IMED options had readily ascertainable fair market values when they were transferred. Further, the *Alves* case involved restricted stock that was issued to the taxpayer, not options. Section 83(e) explicitly excepts from the application of section 83 options without a readily ascertainable fair market value at the time of transfer. There is no such exception for restricted stock.

Petitioners claim to have exhaustively researched the section 83 issue, yet neither they nor the professionals they claimed to have relied upon kept any written notes or memoranda in support of the positions taken on their 1982 returns. Nor did petitioners ask any of their advisers to render a formal opinion on these matters. The only written records produced at trial, pursuant to a subpoena on Arthur Young, memorialized the doubts of the parties as to treating the income from the options as capital gains.

Both Cramer and Monaghan were unequivocally put on notice in 1981 by the Stine letter, which stated that, because "the definition of 'readily ascertainable fair market value' is virtually impossible to meet, IMED's present position [that section 83 governed IMED's stock options] is subject to challenge." The evidence shows that petitioners had serious doubts about the viability of their plan to obtain capital gain treatment upon the sale of the options but that they proceeded because they believed they had nothing to lose and had a large incentive to try.

Boynton testified that he relied on Hendrickson, Monaghan, and Cramer in taking the position on his 1982 return that the option proceeds were long-term capital gains. He also testified that no suggestion was made to him at any time that there was any risk at all in taking such position or that it was subject to challenge in any way. Hendrickson testified that he told all petitioners of the risks they were taking, and we have concluded that Cramer and Monaghan acted with knowledge in taking a position contrary to existing regulations. Cramer and Monaghan would have had to have actively misled Boynton for him to have been unaware of the risk associated with his 1982 tax return position. Petitioners have not suggested and, in view of petitioners' friendship and business relationship, we do not believe, that this occurred. Further, Boynton's 1982 return did not even indicate that he sold his options.

Petitioners argue that they disclosed their positions through their section 83(b) elections and that the IRS was therefore on notice of their treatment of the options. They cite *Belz Investment Co. v. Commissioner,* 72 T.C. 1209, 1233 (1979), affd. 661 F.2d 76 (6th Cir. 1981); *Burbank Liquidating Corp. v. Commissioner,* 39 T.C. 999, 1011 (1963), affd. in part, revd. in part on other grounds, and remanded 335 F.2d

125 (9th Cir. 1964); and *Wesley Heat Treating Co. v. Commissioner,* 30 T.C. 10, 26 (1958), affd. 267 F.2d 853 (7th Cir. 1959), for the proposition that disclosure indicates good faith and makes the negligence addition to tax inapplicable. All of the cited cases involve disclosure on or with the income tax return for the year of the underpayment. There was no disclosure on or with petitioners' 1982 returns. Moreover, petitioners claim to rely on elections filed several years before the year in issue, while on the 1982 returns the sale of the options was misrepresented and in effect concealed. Finally, petitioners reported sales proceeds from IMED options for which section 83(b) elections were made together with proceeds from IMED options for which no election was made.

Petitioners further point to their "consistent" treatment of the options as proof of their good faith. We regard their alleged consistency as further evidence of an ongoing scheme.

Petitioners argue that they are not subject to additions to tax because they disregarded the regulations in reliance on the 1976 conference report and professional articles and believed that the section 83 regulations were contrary to congressional intent. Petitioners were aware that their tax return positions were contrary to the regulations as they then existed and did not have any reasonable basis for valuing the options at zero on the elections they filed. We conclude that petitioners did not act in good faith but deliberately claimed an untenable position and concealed it on their 1982 returns. Accordingly, petitioners are subject to the additions to tax under section 6653(a). See *Grant v. Commissioner,* 84 T.C. 809, 827 (1985), affd. without published opinion 800 F.2d 260 (4th Cir. 1986).

*Substantial Understatement Addition to Tax*

Section 6661(a) provides for an addition to tax on underpayments attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1)(A). Petitioners had substantial understatements in each of the years at issue. The section 6661 addition to tax is not applicable, however, if there was substantial authority for the taxpayer's treat-

ment of the items in issue or if the relevant facts relating to the tax treatment were adequately disclosed on the return. Sec. 6661(b)(2)(B)(i) and (ii).

Petitioners argue that there was substantial authority for the treatment on their returns of the IMED option sales proceeds. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions. *Accardo v. Commissioner*, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); sec. 1.6661-3(b), Income Tax Regs. As evidence that the 1976 conference report should be treated as "authoritative", petitioners point to proposed regulations under sections 1.83-6 and 1.83-7, Income Tax Regs. These proposed regulations provided that options not actively traded on an established market would be presumed not to have a readily ascertainable fair market value at the time of grant, unless certain reporting requirements were satisfied. Petitioners did not satisfy such reporting requirements. Further, the proposed regulations did not indicate that satisfaction of the reporting requirements would guarantee a finding of readily ascertainable fair market value. Finally, these proposed regulations were withdrawn on June 27, 1983, before Cramer and Monaghan filed their 1982 returns. 48 Fed. Reg. 29538 (June 27, 1983). The language in the 1976 conference report is greatly outweighed by the language of the statute, section 83(e), and the regulations in effect at the time the returns were filed. Moreover, as we have previously concluded, the authorities relied on by petitioners do not support the positions taken on their returns.

Petitioners claim that they disclosed their positions for purposes of section 6661 by filing section 83(b) elections in 1978 and 1979. In order to claim adequate disclosure on a return, the disclosure must have been arranged in a manner that "reasonably may be expected to apprise the Internal Revenue Service of the identity of the item, its amount, and the nature of the potential controversy". Sec. 1.6661-4(b)(3), Income Tax Regs. Section 83(b) elections were not filed for all of the options, and for none of the options were copies of the elections filed with the 1982 returns. There was no indication on the returns that elections were filed or that the options were restricted, and, as discussed earlier, each return con-

tained misrepresentations that actually concealed the true nature of the option proceeds. In sum, there was not adequate disclosure on the returns regarding these underpayments.

Petitioners contend that the Commissioner should have granted them a waiver of the section 6661 addition to tax. Section 6661(c) authorizes the Commissioner to waive any part of the addition to tax imposed under section 6661 on a showing that (1) there was reasonable cause for the understatement and (2) the taxpayer acted in good faith. The denial of a waiver under section 6661(c) is reviewable by the Court on an abuse-of-discretion basis. *Mailman v. Commissioner,* 91 T.C. 1079, 1083 (1988).

The most important factor in determining reasonable cause and good faith under section 6661(c) is "the extent of the taxpayer's effort to assess [his] proper tax liability under the law." *Id.* at 1084; sec. 1.6661-6(b), Income Tax Regs. Reliance on the advice of an attorney or accountant constitutes a showing of reasonable cause and good faith under section 6661(c) only if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6661-6(b), Income Tax Regs. The record shows that, after repeated indications that their tax position would be contrary to existing regulations, petitioners did not choose to provide the options and other relevant information to a professional to obtain a reasoned opinion but chose instead to take their chances that the IRS would not challenge their returns. This conduct is not consistent with good faith.

In any event, petitioners' showing of reasonable cause and good faith would serve only to bring them to the point where respondent "*may* waive all or any part of the addition to tax". Sec. 6661(c) (emphasis added). Thus, petitioners must show that the reasonable cause and good faith are so clear that respondent's refusal is arbitrary, capricious, or without sound basis in fact. *Mailman v. Commissioner, supra* at 1084. In these cases, petitioners attempted to obtain long-term capital gain treatment instead of ordinary income treatment to obtain significant tax savings and did not include on their returns sufficient information to put the IRS on notice of the controversial nature of their position. Under these circumstances, we cannot say that respondent abused her discretion in denying a waiver. Accordingly, we conclude that

petitioners are subject to the additions to tax under section 6661.

*Simultaneous Application of Sections 6653(a) and 6661*

Petitioners argue that they cannot be liable for simultaneous additions to tax under both sections 6653(a) and 6661. They contend that the plain meaning of the statute here leads to an unreasonable result that is plainly at variance with the policy of the legislation as a whole, and, thus, under *Ozawa v. United States,* 260 U.S. 178, 194 (1922), we must examine the matter further. Petitioners contend that the legislative history of section 6661 indicates that Congress did not intend for an understatement of income tax to be simultaneously subject to the section 6653(a) addition to tax and the section 6661 addition to tax for a substantial understatement.

Section 6661 contains no provisions precluding the simultaneous assessment of these two additions to tax. The Supreme Court has explained the courts' function in interpreting statutory language as follows:

In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. * * *

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. * * *

[*United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 542-543 (1940); fn. refs. omitted.]

In statutes levying taxes, the literal meaning of the words is most important for interpreting such statutes and is not to be extended by implication beyond the clear import of the language used. *Crooks v. Harrelson,* 282 U.S. 55, 61 (1930); *United States v. Merriam,* 263 U.S. 179, 187-188 (1923); *Masonite Corp. v. Fly,* 194 F.2d 257, 260-261 (5th Cir. 1952). Further, "where a statute is clear on its face, we would require unequivocal evidence of legislative purpose before

construing the statute so as to override the plain meaning of the words used therein." *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984); see *Schwartz v. Commissioner,* T.C. Memo. 1992-677.

Petitioners admit that "literally Section 6661 does not prevent application of both Section 6653(a) and Section 6661 to the same deficiency". Petitioners claim that Congress failed to coordinate the two additions to tax because it did not contemplate the application of section 6661 in situations where section 6653(a) applied and it was therefore unnecessary to coordinate the sections. Because sections 6653(a) and 6661 both apply in such obviously overlapping circumstances, we are unpersuaded by this argument.

Section 6661 was enacted by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 323, 96 Stat. 324, 613. The committee report states:

Taxpayers rely on opinions of tax advisors to avoid the possibility of fraud or negligence penalties in taking these highly questionable positions, even though the advisor's opinion may clearly indicate that if the issue is challenged by the Internal Revenue Service, the taxpayer will probably lose the contest. * * * The committee believes, therefore, that taxpayers should be subject to a penalty designed to deter the use of undisclosed questionable reporting positions. * * * [S. Rept. 97-494, at 273 (1982).]

Petitioners contend that the section 6661 addition to tax remedied the problems discussed in the committee reports by requiring a "substantial authority" standard that is harder to meet than the standard for the section 6653(a) addition to tax and that the section 6661 addition to tax was intended to apply where section 6653(a) did not. The committee reports accompanying TEFRA, however, do not explicitly state that the additions to tax under sections 6653(a) and 6661 cannot be simultaneously imposed on the same understatement of income tax. S. Rept. 97-494, at 273 (1982); H. Conf. Rept. 97-760, at 574 (1982), 1982-2 C.B. 600, 649. Thus, the legislative history does not contain unequivocal evidence to enable us to disregard the plain meaning of the statute. See *Schwartz v. Commissioner, supra.*

Section 6661 was repealed in 1989 by the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, sec. 7721(c)(2), 103 Stat. 2106, 2399. OBRA eliminated the stacking of the accuracy-related additions to tax. H. Conf. Rept.

101-386, at 652 (1989). Petitioners contend that the elimination by Congress of the potential of overlap among the accuracy-related additions to tax is instructive in determining Congress' intent in the earlier passage of section 6661. The House report accompanying OBRA does not indicate, however, that Congress coordinated these additions to tax for the purpose of correcting an error in the interpretation and application of present law. Rather, it indicates that the purpose was to allay "confusion among taxpayers and * * * difficulties in administrating these penalties by the IRS" caused by the number of different "penalties" relating to the accuracy of a tax return and to "significantly improve the fairness, comprehensibility and administrability of these penalties." H. Rept. 101-247, at 1388 (1989). The legislative history repealing section 6661 does not indicate that Congress never intended the simultaneous assessment of the sections 6653(a) and 6661 additions to tax upon the same understatement of income tax. See *Schwartz v. Commissioner, supra.*

In addition, section 6661 does provide that it cannot be imposed on a substantial understatement on which a section 6659 addition to tax is imposed. Sec. 6661(b)(3). Thus, Congress was aware of potential overlap. The statute does not expressly address the simultaneous assessment of any other additions to tax together with those under section 6661. This is evidence that Congress did not intend to preclude the simultaneous assessment of additions to tax under sections 6653(a) and 6661. See *Estate of McClanahan v. Commissioner,* 95 T.C. 98, 106 (1990); *Schwartz v. Commissioner, supra.*

Given that section 6661 is clear on its face, and having found no unequivocal evidence of contrary congressional intent, we apply the plain meaning of section 6661. *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984). Accordingly, we hold that petitioners are liable for the additions to tax under both section 6653(a) and section 6661.

We have considered the other arguments of the parties with respect to both the character of the 1982 income and the additions to tax, and they are either without merit or not necessary in view of our resolution of the issues.

To reflect respondent's concession with respect to the computation of the section 6653(a) addition to tax with respect to the Cramers,

> *Decision will be entered under Rule 155 in docket No. 27682-90.*
>
> *Decisions will be entered for respondent in docket Nos. 27684-90 and 29100-90.*