T.C. Memo. 1997-29


UNITED STATES TAX COURT


ALBERT J. HENRY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARY HENRY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 27188-91, 1987-92.        Filed January 16, 1997.


<u>Timothy M. Hughes</u>, <u>Charles F. Gibbs</u>, and <u>William G. Cavanaugh</u>, for petitioners.

<u>June Y. Bass</u> and <u>Valerie N. Larson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a deficiency in petitioners' 1982 Federal income tax in the amount of $2,099,534

and additions to tax pursuant to sections 6653(a)(1)[1] and 6661 in the amounts of $104,976.70 and $524,883.50, respectively.

The issues remaining for our consideration concern whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) and section 6661 for the taxable year 1982. The parties have stipulated that the conclusions in Cramer v. Commissioner, 101 T.C. 225 (1993), affd. 64 F.3d 1406 (9th Cir. 1995), control as to the underlying income tax deficiency.

In Cramer v. Commissioner, supra, the taxpayers, like petitioner Albert J. Henry, were shareholders and officers in a corporation that issued certain stock options subject to restrictions on vesting and transfer in connection with their performance of services for the corporation. For certain of the options, the taxpayers filed "section 83(b) elections" in which they reported the fair market value of the options as zero. Upon the sale of the options to an unrelated company in 1982, the taxpayers misstated the transactions on their returns, reporting them as gains from the sale of capital assets. We sustained respondent's determination that the proceeds from such options were taxable as ordinary income at the time of disposition because the options did not have "readily ascertainable fair market values" as defined in section 1.83-7, Income Tax Regs.

---

[1] All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT[2]

Petitioners Albert J. Henry and Mary Henry resided in San Diego, California, and Scarborough, North Yorkshire, England, respectively, at the time of filing petitions in these cases. Petitioners' 1982 joint Federal income tax return was prepared by their accountant, Robert E. Douglas (Douglas), who signed it as the preparer on April 15, 1983.

Albert J. Henry (Henry) has a bachelor of science degree in civil engineering as well as a master's degree in business administration.  Between 1962 and 1968, Henry worked as a lending officer at First National City Bank (First National) in New York City.  In that capacity, subject to approval, he reviewed and prepared credit lines for businesses.

After his tenure with First National, Henry worked in Los Angeles and New York City for firms that were members of the New York Stock Exchange.  In that regard, Henry prepared institutional research reports on growth companies for use by entities like mutual and pension funds, as well as banks.

Institutional reports are intended to cover a particular company's products, what the projected growth rate might be, and what sort of proprietary advantages the company might have. These reports were designed to give money managers an idea of the value of a company's stock.  These reports do not incorporate

---

[2] The parties' stipulation of facts and exhibits are incorporated by this reference.

- 4 -

information on tax matters involving the particular company in question.

IMED Corp. (IMED)

Richard A. Cramer (Cramer) founded IMED, a company engaged in the design, manufacture, and sale of electronic medical instruments, primarily a device known as an "infusion pump", and related disposable devices.  From 1972 through August 1982, Cramer was a shareholder, president, chairman of the board of directors, and chief executive officer of IMED.  From 1972 through August 1982, Warren K. Boynton (Boynton) was vice president of IMED.  Boynton was on the board from 1972 through October 1973 and from December 1974 through August 1982.

Kevin P. Monaghan (Monaghan) served as outside general counsel to IMED from its inception in 1972 until August 1982. From August 1975 through August 1982, Monaghan was assistant secretary of the board of directors of IMED (the board). Monaghan was an attorney admitted to practice in California. Cramer, Boynton, and Monaghan were close friends as well as business associates.

Dan R. Hendrickson (Hendrickson) was hired as a corporate controller of IMED on March 8, 1976, and became treasurer of IMED on February 14, 1978.  Hendrickson previously had prepared Cramer's personal income tax returns for a number of years.  At IMED, Hendrickson reported directly to Cramer on the financial condition of the company and the associated tax liabilities.

The stock of IMED was neither publicly traded on an established stock market exchange nor registered with the Securities and Exchange Commission from 1978 through 1981.  The directors and three or four key officers owned approximately 75 percent of the outstanding IMED stock.

On March 1, 1978, Henry joined IMED as vice president-finance and chief financial officer (CFO).  Initially, Henry was expected to raise equity for IMED and to institute financial controls.  Later on, Henry was in charge of determining IMED's capital needs, preparing cash-flow forecasts, and raising cash as necessary.  As IMED's CFO, Henry was directly responsible to Cramer and met with him daily.  At IMED, Henry was one of the IMED officers who could meet with Cramer on an unscheduled basis.  Also, occasionally Cramer and Henry would go out to dinner and discuss business.  Henry also saw Boynton, who was number two in IMED's hierarchy, on a daily basis since his office was nearby.  However, Henry did not have frequent contact with Monaghan at IMED.

When Henry became the CFO of IMED, Hendrickson was responsible for the accounting department.  As IMED's CFO, Henry was Hendrickson's direct supervisor.  Hendrickson's office, however, was located in another building at the same office compound.  When Henry began work for IMED, the accounting department had approximately 10 people who reported to

Hendrickson. Later, the department expanded to approximately 50 people.

In general, Henry considered Hendrickson to be competent, diligent, and responsible. Henry believed Hendrickson would apprise him of important financial matters within the ambit of the accounting department. Also, Henry socialized with Hendrickson once every couple of months, as well as having lunch with him on a regular basis. Otherwise, Henry did not regularly socialize with the other officers and directors of IMED.

IMED also maintained outside auditors, Arthur Young & Co. (Arthur Young), which performed audits of the financial statements at the end of the fiscal year. From 1974 until 1980, the principal contact at Arthur Young was Kim Rutledge (Rutledge), an accountant. Rutledge primarily had contact with Hendrickson and his predecessor at IMED.

On March 1, 1981, Henry became a member of IMED's board of directors (the board) and remained in that position until August 1982. When Henry joined the board, Cramer, Boynton, Monaghan, and two other individuals were on it. On occasion, prior to joining the board, Henry would present financial statements for review and brief the directors on company operations.

IMED Stock Options

IMED instituted a stock option plan that it granted to certain employees. The stock options granted were intended to enable employees to participate in IMED's growth and prosperity.

This particular program was managed by Cramer, Monaghan, and Hendrickson.

In the process of granting stock options to its employees, IMED required the participants to file elections pursuant to section 83(b) (section 83(b) elections).[3]  Generally, IMED did not issue Forms W-2 or 1099 to any option grantee for the year in which the option was issued.  Subsequent to the section 83(b) election, IMED did not deduct the costs of the stock options it granted to its employees because that might result in the realization of ordinary income by the recipients.

On August 17, 1979, Henry received his first stock options (1979 options).  The 1979 options granted Henry the right to purchase 29,250 shares of IMED's common stock.  The par value of the common stock was 15 cents per share.  Henry could exercise his options to purchase stock at $13 per share.

On September 14, 1979, Hendrickson presented Henry with a section 83(b) form to sign.  Hendrickson further informed him that this document was required to be signed in order to obtain long-term capital gains on the 1979 stock options.  The document contains the note that, as a condition of exercising these

---

[3] Sec. 83(a) provides generally that if property is transferred to an individual as compensation for services, recognition of income will be deferred if the property is not transferable or is subject to a substantial risk of forfeiture.
Sec. 83(b) provides, in relevant part, that the employee may elect within 30 days of receipt to include the value of the property for the year he receives it, despite the fact that such property is nontransferable and forfeitable.

particular stock options, continued employment with IMED was a requirement.  The document also includes the provision that the fair market value was "none" and there were no amounts currently paid in.

The 1979 options provided that the optionee could exercise the options "in 20% increments through the fifth-year end anniversary hereof, so long as he is, at such anniversary date, still an employee or consultant to IMED".  The 1979 options also contained the following vesting schedule:

| Percentage of Shares Underlying the Options That May Be Exercised | Earliest Date Upon Which Optionee May Exercise | Last Date Upon Which Optionee May Exercise |
| --- | --- | --- |
| 20 | Dec. 31, 1979 | June 30, 1984 |
| 40 | Dec. 31, 1980 | June 30, 1984 |
| 60 | Dec. 31, 1981 | June 30, 1984 |
| 80 | Dec. 31, 1982 | June 30, 1984 |
| 100 | Dec. 31, 1983 | June 30, 1984 |

The 1979 options were transferable, subject to the vesting provisions, only to persons approved by the board as "qualified offerees".  The approval of the board was stated to be contingent on the receipt of a favorable opinion of counsel and could be refused if the transfer would require registration under section 5 of the Securities Act of 1933, ch. 38, 48 Stat. 74, 77, as amended, 15 U.S.C. sec. 77a (1988).

Simultaneously with his signing of the section 83(b) election for the 1979 options, Henry was provided with a copy of a letter from IMED.

Dear Option Holder:

Congratulations on your recent stock option.

The enclosed election, which is necessary to provide for capital gain treatment upon ultimate stock sale by you, should be signed by you (and your spouse where applicable) and returned to Dan R. Hendrickson, at IMED before September 30, 1979.

The original will be filed with the Internal Revenue Service and a copy retained in the files of IMED. The second copy enclosed is for your records.

You have no income to report at this time, as the election is protective only.

Very truly yours,

[signed]
Dan R. Hendrickson
Treasurer

Sometime in March 1980, Henry exercised a portion of the 1979 options to the extent that he acquired 4,000 shares of IMED common stock at $13 per share. The 1979 options still conferred on Henry the right to purchase the remaining 25,250 shares. On October 16, 1980, Henry sold the 4,000 shares of IMED common stock for $190,000.

In December 1980, John Stine (Stine) replaced Rutledge as the Arthur Young tax principal performing corporate tax work for IMED. Stine's main contact at IMED was Hendrickson. Stine also talked with Monaghan on occasion. As tax principal for Arthur Young, Stine did not consult with Henry on tax matters.

On May 29, 1981, IMED and IMED International Corp. (International), a Cayman Islands, British West Indies,

corporation, formed a trust with a Swiss corporation as trustee.[4]
The Swiss trustee was entitled to exercise stock options (the
1981 options) on behalf of certain enumerated individuals
designated as the "Beneficiaries". The 1981 options were
allocated as follows:

| Name[1] | Number of Paired Shares | Exercise Price |
|---------|-------------------------|----------------|
| Cramer | 50,000 | $100 |
|  | 100,000 | 200 |
| Boynton | 50,000 | 100 |
| Henry | 50,000 | 100 |
| Monaghan | 25,000 | 100 |

[1] There are two other beneficiaries who were members of
IMED's board, but they are not part of these cases, and hence,
need not be identified.

The trust agreement was signed by Cramer, as chairman of both
IMED and International. Subsequently, Henry was informed by
Cramer that he would receive additional stock options. Henry did
not sign or receive certificates or documents with respect to the
1981 options.

On May 27, 1981, Monaghan wrote to Hendrickson, noting that
stock options in IMED had been granted to certain employees, and
requesting that the aforementioned individuals sign section 83(b)
elections and file them by June 17, 1981.

On October 28, 1981, Stine, of Arthur Young, sent both
Monaghan and Hendrickson a letter which stated:

---

[4] On Oct. 3, 1980, the outstanding shares of IMED and
International were "paired" so that the stock of neither company
could be issued or sold without the simultaneous issuance or sale
of an equal number of shares of the other company.

IMED currently takes the position that its stock options are governed by Section 83 and therefore the present tax treatment is * * * no income to the employee on grant or exercise and no compensation deduction to IMED. However, Regulation 1.83-7 states that an option must have a "readily ascertainable fair market value" before Section 83 will apply. Since the definition of "readily ascertainable fair market value" is virtually impossible to meet, IMED's present position is subject to challenge. * * *

On November 12, 1981, Monaghan informed Hendrickson that certain IMED employees had obtained options on IMED stock, but that the options "should not be delivered to the holders until their Section 83 elections have been prepared and are ready to file."

In an undated form letter from Robert Reiss, president of IMED, employees participating in the stock option plan were informed that the section 83(b) elections were "necessary to provide for capital gain treatment upon ultimate stock sale by you". This document further states that the recipient has "no income to report at this time, as the [section 83(b)] election is protective only."

## IMED's Sale

In early 1982, Cramer, along with the majority of IMED's stockholders, met with investment bankers to proceed with the sale of IMED. Henry was always present with Cramer when prospective purchasers came to perform due diligence investigations with respect to IMED.

On May 6, 1982, the management of Warner-Lambert Corp. (Warner-Lambert) approached the officers and directors of IMED to propose a transaction whereby Warner-Lambert would acquire all the outstanding stock of IMED and its subsidiaries. Initially, Warner-Lambert offered $480 million, subject to a due diligence investigation.

As part of the negotiations, Cramer, Monaghan, Boynton, and Henry, as IMED's executive officers, went to Warner-Lambert's corporate offices in New Jersey. As IMED's CFO, Henry was required to supply financial analyses, as well as discuss the projected market and product forecasts. At some point during the sale negotiations, Henry told Cramer that he thought that the stock options should be long-term capital gains.

In the IMED sale negotiations, the executives from both companies recognized that there would be a problem with IMED's employee stock options. Warner-Lambert realized that if the options were not exercised, then IMED would not have $30 million to $40 million in its treasury at the time of sale. Consequently, in New Jersey, Cramer met with Ward Hagen, the chief executive officer of Warner-Lambert. When the meeting ended, Cramer told Monaghan, Boynton, and Henry that the option holders would obtain long-term capital gain treatment and instructed Monaghan to structure the transaction to achieve such long-term capital gain. Warner-Lambert was persuaded to purchase the employee stock options and to forgo a deduction in its 1982

Federal income tax return for the cost of purchasing the options. However, Warner-Lambert reduced the offer for IMED from $480 million to $465 million.

During the final negotiations, the officers and directors of IMED met with the law firm Skadden, Arps, Slate, Meagher & Flom (Skadden, Arps), which represented Warner-Lambert in New York City. After a meeting with the attorneys from Skadden, Arps in Manhattan, Monaghan informed Henry that he had structured the options as long-term capital gain. Subsequently, Monaghan told Boynton, in response to Boynton's question, that the option proceeds would be treated as long-term capital gain.

On July 8, 1982, the Swiss trust that held the 1981 options was dissolved. The assets of the trust, the 1981 options, reverted to IMED. In August 1982, Warner-Lambert purchased all of the outstanding stock of IMED for approximately $163 per paired share of stock in IMED and International. Warner-Lambert paid a total of $465 million for all of the outstanding stock plus the extant stock options belonging to employees of IMED.

Warner-Lambert, through IMED, issued Henry a 1982 Form W-2 that was filed as part of petitioners' 1982 Federal income tax return declaring $92,874.60 as income. Neither Warner-Lambert nor IMED provided Henry with another Form W-2 or 1099 or other form or statement that declared his stock option proceeds as income.

Robert E. Douglas

Douglas, a certified public accountant, prepared petitioners' 1982 Federal income tax return. He was licensed in California and, since 1977, a partner in the firm of Jassoy, Graff & Douglas. Henry was introduced to Douglas by Hendrickson, who informed him that Douglas was an "excellent, very careful accountant". Between 1968 and 1974, Douglas worked in the tax department of Price Waterhouse. While at Price Waterhouse, Douglas was an instructor in its national tax course. Between 1974 and 1977, Douglas practiced with George Peterson & Co.

As petitioners' accountant, Douglas prepared their 1977 through 1982 joint Federal income tax returns. Petitioners' 1978, 1979, and 1980 returns were audited by respondent. Douglas represented petitioners in these audits, which resulted in minor adjustments to petitioners' returns. Generally, Henry was satisfied with the manner in which Douglas handled the audits.

Henry informed Douglas that IMED had been sold, and that it was Henry's understanding that Monaghan, as IMED's counsel, had structured the stock options as long-term capital gain. Henry also advised Douglas that if there were any questions regarding the handling of the options to contact Monaghan or Hendrickson.

Douglas agreed with his partner, Robert W. Jassoy Jr., that the option proceeds should be classified as long-term capital gain on the income tax returns he prepared for petitioners. In reaching this decision, Douglas considered as a factor that there were no Forms W-2 or 1099, nor any other form, issued by either

Warner-Lambert or IMED, declaring the option proceeds as income. Also, based on an earlier discussion with Hendrickson regarding IMED's stock option plan, Douglas surmised that Arthur Young approved the tax treatment of the stock option proceeds based on the legislative history of section 83. In addition, Douglas believed that the attorneys representing Warner-Lambert and IMED had structured the transaction to accomplish long-term capital gain for the option holders. Finally, in reaching his decision, Douglas relied on the fact that Hendrickson had informed him about the section 83(b) elections. Douglas concluded that the elections put respondent on notice regarding the stock options. However, Douglas knew that there was a distinct possibility that respondent might challenge the classification of Henry's stock option proceeds as long-term capital gain.

Douglas prepared petitioners' 1982 joint Federal income tax return. Henry provided Douglas with the Form W-2 that he obtained, through IMED, from Warner-Lambert. Douglas, however, did not review the option documents or the option plan.

Petitioners' 1982 Federal income tax return reported income from wages of $92,875 and capital gain of $3,462,345. On the Schedule D included with their 1982 Federal income tax return, petitioners reported a short-term loss of $3,796 and long-term capital gains of $8,636,553, the net of which resulted in the $3,462,345 after considering the deduction for capital gains.

Next to both entries was the following reference: "SEE ATTACHED
COMPUTER D".

On Schedule D, a schedule petitioners included with their
1982 Federal income tax return, they listed their capital gains.
Petitioners reported:

| Productive Assets | Date Acquired | Date Sold | Gross Sale Price | Cost or Other Basis | Gain or[1] (Loss) |
|---|---|---|---|---|---|
| 10,000 shares IMED Corp. | 1980 | 1982 | $1,638,100 | -0- | $1,638,100 |
| 25,250 options IMED Corp. | 1978 | 8/19/82 | 3,807,953 | -0- | 3,807,953 |
| 50,000 options IMED Corp. | 1981 | 8/19/82 | 3,190,500 | -0- | 3,190,500 |

[1] This column reflects gains reported under the category of "More than 1, 5 years or less".

Petitioners reported a total of $8,636,553 as long-term capital
gain in the "FEDERAL TOTALS" column.  On the second page of the
Schedule D, petitioners reported a net gain of $8,655,862.

Hendrickson had overall corporate tax responsibility within
IMED.  Hendrickson apprised Henry concerning matters related to
petitioners' personal taxes but believed that was not
specifically part of his duties at IMED.  Hendrickson stated that
it became apparent, sometime in 1977 or 1978, that with respect
to the stock options, unless something was changed, long-term
capital gain was not a possibility.  Hendrickson also believed
that it would be difficult to overturn the particular regulation
in question.  Hendrickson warned some of the option holders that
capital gain was not guaranteed.  At the time of IMED's sale in
1982, Hendrickson knew that the stock option proceeds were not
entitled to long-term capital gain treatment.

Monaghan was aware of "ongoing discussions" regarding the
proper tax treatment of the stock options throughout the

corporate life of IMED.  Monaghan believed that members of the board would have been aware of these discussions, as well as Rutledge at Arthur Young.  Monaghan discussed the stock options with Henry.

Monaghan believed that upon analyzing the tax provisions related to stock options, a section 83(b) election would ensure that the proceeds would be treated as long-term capital gain. However, Monaghan understood that there were some risks associated with the section 83(b) election for the stock optionees.

Boynton believed that there had been no discussions among the officers and directors of IMED who were negotiating the sale of the company to Warner-Lambert regarding the taxation of the employee stock options.  However, Boynton was aware of discussions of how Warner-Lambert would acquire the outstanding employee stock options.  Boynton discussed the tax treatment of the proceeds of the IMED options only with Monaghan.  Boynton was otherwise unaware of the possibility that respondent might challenge the long-term capital gain treatment of his stock option proceeds and considered it Hendrickson's responsibility to handle tax matters as well as the stock option plan.

As the chief executive officer of IMED and majority stockholder, Cramer considered Henry to be an important individual in the company.  However, Cramer considered Henry to be "the one outsider" in IMED.  The 1981 options granted to Henry

were for services rendered, although Cramer noted that Henry had not yet accomplished anything of substance at the time of the grant.

OPINION

Petitioners concede that they are liable for the underlying income tax deficiency but contend that they are not liable for the additions to tax. In that regard, petitioners bear the burden of proof with respect to the additions to tax. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Respondent argues that petitioners were negligent inasmuch as they knew that: (1) When granted, the options did not have readily ascertainable fair market values; (2) the options did not have fair market values of zero at the time they filed their section 83(b) elections; and (3) at the time the 1982 Federal income tax returns were filed, their positions were subject to challenge. Petitioners, on the other hand, contend that they did not misrepresent the sale of the options, relied on professional advisers, and acted in good faith in reporting the sales of the options. The success of petitioners' contentions is dependent in part on their claim that they were unaware of the concerns of other top echelon officers of IMED, even though Henry was a director and part of that group.

For 1982, section 6653(a)(1) provides for an addition to tax equal to 5 percent of the underpayment in tax if any part of the underpayment is due to negligence or intentional disregard of

rules and regulations.  Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest payable under section 6601 on that portion of the underpayment in tax attributable to such negligence or intentional disregard.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Niedringhaus v. Commissioner, 99 T.C. 202, 221 (1992); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).  We also consider the taxpayer's experience and knowledge in determining whether he acted negligently or intentionally disregarded rules and regulations.  Vandeyacht v. Commissioner, T.C. Memo. 1994-148; DeRochemont v. Commissioner, T.C. Memo. 1991-600.

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) by relying on competent professional advice if it was reasonable to rely on such advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense

to negligence but rather a factor to be taken into consideration. In order for reliance on professional advice to excuse a taxpayer from the additions to tax for negligence, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide valuable and dependable advice on the matter at hand.  Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995).

There were three taxpayers before this Court in Cramer v. Commissioner, 101 T.C. 225 (1993).  Two of the taxpayers claimed millions of dollars' worth of basis for their options, and the third reported his sale of the options as a straightforward sale of stock.  We found in Cramer that the options, when granted, did not possess a readily ascertainable fair market value.  The taxpayers in Cramer filed section 83(b) elections while knowing that the options did not have fair market values of zero. Finally, they knew at the time they filed their 1982 Federal income tax returns that their position was subject to being challenged.  Consequently, we held that the taxpayers in Cramer were subject to the additions to tax for negligence in part because they signed 1982 returns that they knew, at the time, contained material misrepresentations.  The Court of Appeals for the Ninth Circuit affirmed the imposition of the negligence addition.  64 F.3d at 1414-1415.

Here, petitioners argue that they were in a different position from the Cramer taxpayers in that they properly relied on the professional evaluation and advice of their independent certified public accountant, Douglas, when they reported a basis of zero in the stock options on their 1982 joint income tax return. Petitioners also contend that they did not know that the proceeds from the stock options were not long-term capital gain. Based on these claimed differences, they argue that they were not negligent.

Under the circumstances here, petitioners' reliance was not reasonable. We agree with respondent that petitioners were negligent in reporting the proceeds from the sale of the options as long-term capital gain on their 1982 return. Their claims of good faith are not supported by the record.

Petitioners contend that Douglas alone made the decision to classify the option proceeds as long-term capital gain. Petitioners further contend that they had no reason to question Douglas' classification of the option proceeds as long-term capital gain. Petitioners explain that when Douglas was hired as their accountant, Henry was informed that Douglas had an impressive professional background. In addition, petitioners were pleased with Douglas' representation in several audits of prior years. Accordingly, petitioners argue that, at the time Douglas started work on petitioners' joint 1982 Federal income

tax return, they had every reason to rely on his professional acumen.

Respondent points out, however, that Henry was a sophisticated businessman who functioned in a highly competitive environment and should not be allowed to claim reliance on his adviser if he failed to provide the adviser with correct and complete information. See Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Specifically, in preparing the 1982 returns, Douglas was not provided with copies of the relevant IMED options.

Douglas stated that he alone determined that the stock option proceeds were long-term capital gain in petitioners' joint 1982 Federal income tax return. In his testimony, Douglas discussed various factors that he incorporated in his ultimate conclusion that the stock option proceeds were capital gain. Douglas, however, was not sufficiently informed to reach that conclusion. He knew that there was a chance that respondent would challenge the tax treatment. Henry told Douglas to ask for more information from either Monaghan or Hendrickson with respect to the stock option plan. However, Henry specifically informed Douglas that long-term capital gain treatment for the stock option proceeds was warranted.

Douglas admitted that petitioners did not provide him with certain relevant information such as copies of the 1979 or the 1981 IMED options. Petitioners did not provide an explanation as to why these particular documents were not produced to their

accountant.  In other words, petitioners failed to provide their accountant with sufficient information to render a fully informed opinion concerning the relevant facts and law.  See <u>United States v. Boyle</u>, <u>supra</u>; <u>Freytag v. Commissioner</u>, <u>supra</u>.  Moreover, blind reliance on another for the accuracy of a return is generally insufficient to avoid liability for negligence additions to tax.  See <u>Bailey v. Commissioner</u>, 21 T.C. 678, 687 (1954).  Here, it was not reasonable to rely on Douglas' conclusion because he was not fully informed by petitioners.

Henry contends that he reasonably believed that the stock option proceeds were long-term capital gain, for the following reasons:  (1) Because of IMED's section 83(b) program; (2) the fair market value of the stock options was entered as zero in the election that Henry signed; (3) IMED provided Henry with a letter that stated that the election "is necessary to provide for capital gain treatment upon ultimate stock sale"; (4) Hendrickson informed Henry that the election was necessary to obtain long-term capital gain treatment; (5) Henry was informed that the option proceeds were long-term capital gain by both Cramer and Monaghan; (6) subsequent to IMED's sale, Henry did not possess Forms W-2 or 1099 that reflected the stock option proceeds as income.

Although there were many self-serving assertions that capital gains were the proper treatment, the record supports our finding that petitioners were aware that the stock option

proceeds were not properly characterized as long-term capital gain. In particular, in March 1980, Henry exercised the right to acquire 4,000 shares of IMED common stock for $13 per share. Later, Henry sold these shares of stock on October 16, 1980, for $190,000. Thus, petitioners sold the shares for $47.50 per share, some $34.50 more than the option price. Moreover, Henry's education and work experience enabled him to value stock and growth projections for companies. Consequently, Henry knew or should have known that the section 83(b) election, which he signed in September of 1979, was invalid insofar as it stated that the fair market value of the 1979 options was zero.

Also, petitioners cannot rely on Hendrickson's statements made concerning the election nor the IMED form letter obtained on September 14, 1979, to negate additions to tax for negligence attributable to their 1982 return. In general, petitioners had an obligation to independently verify their own proper income tax liability. In other words, petitioners failed to ask pertinent questions or even make a cursory investigation beyond the information provided to them concerning the IMED stock options. See LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); see generally sec. 1.6661-6(b), Income Tax Regs. Moreover, the duty of filing accurate tax returns

cannot be avoided simply by delegating responsibility to an agent.  <u>Pritchett v. Commissioner</u>, 63 T.C. 149, 174 (1974).

Henry argues that he was not part of the core group that controlled IMED and that he would not be privy to the "ongoing" discussions with Cramer, Monaghan, and Boynton regarding the stock options.  Respondent, however, points to the fact that Hendrickson was responsible to Henry in the organizational scheme within IMED.  In other words, Hendrickson's responsibility as the head of IMED's accounting department included conveying his interpretations of the Internal Revenue Code to Henry.

Hendrickson's responsibilities in the corporation included informally advising Henry with respect to his own taxes.  Henry and Hendrickson socialized once every couple of months, as well as having lunch with each other on a regular basis.  In connection with the sale negotiations with Warner-Lambert, Henry was required to supply financial analyses, as well as discuss the projected market and product forecasts.  Although Henry's responsibilities did not specifically encompass taxation issues, the tax treatment of the stock options was a critical consideration.  In particular, we note that a major item that was negotiated involved Warner-Lambert's forgoing a deduction on its 1982 Federal income tax return for the payment of the option purchase proceeds.  That issue was important enough for Cramer to meet with the head of Warner-Lambert.  Also, Henry admitted, during the sale negotiations, he expressed his belief to Cramer

that the stock option proceeds should be long-term capital gain. At the very least, Henry was aware that Warner-Lambert chose to coordinate with IMED on the issue of the proper taxation of the outstanding stock options.

Hendrickson introduced Douglas to Henry and gave Douglas an excellent recommendation. Douglas had been in contact with Hendrickson regarding the IMED stock option plan when it was set up, and he gave Douglas the impression that Arthur Young had approved of the tax treatment of IMED's stock option plan. Hendrickson addressed important tax matters with Henry and also likely apprised him of the issue of the proper characterization of the stock option proceeds.

It should also be noted that in 1981 Hendrickson was placed on notice by the Stine letter that because "the definition of 'readily ascertainable fair market value' is virtually impossible to meet, IMED's present position [that section 83 governed IMED's stock options] is subject to challenge." The top executives and officers of IMED believed that the proper treatment of the stock option proceeds was as long-term capital gain. Yet the record does not reflect that their belief was based on thorough research or analysis. Nor did they consult their tax professionals concerning the section 83 option issue. In this setting, the Stine letter is the only in-depth inquiry concerning the proper taxation of the income from the option proceeds. It appears improbable that the significance of the Stine letter would escape

Henry and Hendrickson, especially because it contained an opinion contrary to their hoped-for capital gains reporting of the IMED stock options.

Finally, Cramer and Monaghan informed Henry at the IMED sale negotiations in New Jersey that the stock option proceeds would be structured as capital gain. In general, tax reduction is an acceptable goal as long as the reduction involves transactions with substance and is by legal means. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). It does not, however, enable a taxpayer to ignore relevant information.

There were numerous opportunities for petitioners to learn of the questionable status of the capital gain tax treatment of the stock options. Hendrickson warned at least some of the IMED stock optionees at the time they signed their section 83(b) elections that the IMED options program was contrary to the regulations promulgated by respondent. Monaghan knew there was a possibility that the Commissioner would challenge IMED's treatment of the stock option proceeds, and he initiated "ongoing" discussions among the officers and directors of IMED concerning this particular issue. Also, Cramer advised the other three IMED negotiators (which included Henry), subsequent to a meeting with the chief executive officer of Warner-Lambert, that the option proceeds would be deemed long-term capital gain. This rebuts petitioners' contention that the options were not considered in the sale negotiations with Warner-Lambert.

Additionally, Henry did not provide any other reasonable explanation as to why Warner-Lambert decreased the final purchase price paid for IMED from $480 million to $465 million. In these circumstances, Henry's plea of ignorance does not ring true. Henry's involvement at the top level of IMED and in the Warner-Lambert negotiations undermines his plea of ignorance, and we so find. Cf. United States v. Aleman, 728 F.2d 492, 494 (11th Cir. 1984); United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976) (defining "'wilful blindness'").

In Cramer v. Commissioner, 101 T.C. 225 (1993), we decided Cramer, Boynton, and Monaghan were liable for additions to tax for negligence because they deliberately disregarded rules and regulations. In that opinion, it was indicated that Boynton was aware of the potential risk that the Commissioner might challenge the treatment of the stock option proceeds because of his close friendship with Cramer and Monaghan. "Cramer and Monaghan would have had to have actively misled Boynton for him to have been unaware of the risk associated with his 1982 tax return position", and this event was unlikely to have occurred "in view of * * * [the taxpayers'] friendship and business relationship". Id. at 253.

Although Cramer referred to Henry as "the one outsider" on IMED's board, he met with Henry on a daily basis and occasionally went out to dinner with him. Also, Henry was involved in the negotiations regarding the sale of IMED to Warner-Lambert and was

one of the four IMED executives who were delegated to pursue the sale negotiations with Warner-Lambert. Henry and the other top level IMED officers possessed significant amounts of the 1981 options. The potential value and possible tax treatment of the options to the IMED officers was certain to be a prominent topic of conversation. We find it difficult to believe that IMED's chief financial officer would not be privy to this and/or be oblivious to the concerns of the other officers, who, along with Henry, ran IMED. Henry may have entered the top echelon of IMED after Cramer and his nucleus of associates, but he was not an "outsider" regarding IMED's daily business operations.

Respondent's determination that petitioners were negligent is sustained. Petitioners' claims of good faith are undermined by the totality of the circumstances. Based on the testimony from Hendrickson, Monaghan, and Douglas, the record demonstrates that Henry was aware of the risks involved in reporting all of the proceeds from the sale of the 1979 and 1981 stock options as long-term capital gain. Moreover, Henry did not provide Douglas with all the information Henry knew about the 1979 or 1981 options. For example, if Douglas had been made aware of the fact that the value of the 1979 options was not zero, that would likely have had a profound effect on the accountant's evaluation of the proper tax treatment of the option proceeds. Finally, the fact that Henry referred Douglas to either Hendrickson or Monaghan if there were any questions regarding IMED's stock

option program does not obviate Henry's responsibility to ensure that the 1982 return was accurately filed. See LaVerne v. Commissioner, 94 T.C. at 652-653; Pritchett v. Commissioner, 63 T.C. at 174; see generally sec. 1.6661-6(b), Income Tax Regs. Accordingly, we hold that petitioners are liable for the additions to tax for negligence.

## Substantial Understatement Addition to Tax

Next, petitioners contend that respondent erred in determining additions to tax for substantial understatements under section 6661. Section 6661(a) imposes an addition to tax when there is a "substantial understatement of income tax for any taxable year". As applicable here, the addition to tax under section 6661(a) is equal to 25 percent of the underpayment attributable to the substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). Petitioners bear the burden of proving that the addition to tax under section 6661 is not applicable. Rule 142(a).

Section 6661(b)(2)(A) defines "understatement" as the excess of the amount of tax required to be shown on the return over the amount of tax actually reported on the return. This understatement will be "substantial" if the amount of such understatement exceeds the greater of 10 percent of the amount of tax required to be shown on the return for the taxable year, or $5,000. Sec. 6661(b)(1)(A).

The section 6661 addition to tax is not applicable, however, if there was substantial authority for the position taken on the taxpayer's return, or adequate disclosure in the return of the relevant facts affecting the treatment of the item. Sec. 6661(b)(2)(B)(i) and (ii).

Petitioners have not contended that there was substantial authority for their reporting position. Petitioners contend that the tax treatment of the proceeds of the sale of IMED's stock options was adequately disclosed in their return as filed. Respondent disputes that petitioners adequately disclosed the item in question.

In Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987), we explained that the regulations provide for two types of adequate disclosure for purposes of section 6661(b)(2)(B)(ii): Disclosure in a statement attached to the return or disclosure on the return pursuant to the Commissioner's revenue procedures. Sec. 1.6661-4(b) and (c), Income Tax Regs. In addition, we noted that a taxpayer may satisfy the adequate disclosure requirement of section 6661(b)(2)(B)(ii) by providing on the return sufficient information to enable the Commissioner to identify the potential controversy involved.

Petitioners' expert witness, John J. Monaco (Monaco), was previously Assistant Commissioner (Examination) for respondent, where he was an employee for 33 years. Monaco opined that the zero basis reported on the return would be adequate disclosure of

the relevant facts.  Monaco concluded that such disclosure was
sufficient to apprise respondent of the facts and the nature of
the potential controversy concerning the tax treatment of the
item.  Monaco decided that the zero basis "would be a clear
indication that the options had been awarded to the employee as
compensatory stock options and that no value had been reflected
in * * * [Henry's] income either at the time the options were
received or at any other time prior to the sale of such option."
Monaco stated that there was no other likely explanation for a
zero basis.  Monaco opined that the zero basis reported on
petitioners' 1982 return was sufficient to apprise respondent of
the tax treatment of the item in question.  Based on his
experience, Monaco believed that a return with a reported zero
basis for employee stock options and claimed capital gain
treatment would be selected for examination.

In the present cases, petitioners' 1982 return identified
the property in question and clearly distinguished between stocks
and options.[5]  Furthermore, the return disclosed the dates the
shares and options were acquired and sold, sales price, a basis
of zero, and the gain involved.  It appears likely that the items

---

[5] It should be noted that in Cramer v. Commissioner, 101
T.C. 225, 255-256 (1993), affd. 64 F.3d 1406 (9th Cir. 1995), the
returns, unlike petitioners', "contained misrepresentations that
actually concealed the true nature of the option proceeds"; i.e.,
a false claim of basis or, in the Boyntons' case, a
mischaracterization of the options as stock.  See also 64 F.3d at
1415.

reported generated respondent's audit. The information reported
was sufficient to apprise respondent of and enable respondent to
identify the potential controversy involved here; that is,
whether petitioners properly treated the stock option proceeds as
long-term capital gain.

We hold that petitioners adequately disclosed the
information and are not liable for the addition to tax under
section 6661.[6]

Interest

Petitioners argue that we should abate interest on the
income tax deficiency pursuant to section 6404(e) because of
respondent's delay in issuing the notice of deficiency.
Specifically, petitioners assert that respondent was dilatory in
issuing the notice of deficiency, thus increasing the interest
payable.

The United States Tax Court is a court of limited
jurisdiction. See sec. 7442; Wilt v. Commissioner, 60 T.C. 977,
978 (1973). New section 6404(g), added to the Internal Revenue
Code by section 302 of the Taxpayer Bill of Rights 2, Pub. L.
104-168, 110 Stat. 1452, 1457 (1996), authorizes this Court to
review the Secretary's failure to abate interest only with
respect to requests for abatement made after July 30, 1996.
Because these cases do not involve a request for abatement made

---

[6] Accordingly, we do not reach petitioners' argument with
respect to sec. 6661(c).

after July 30, 1996, we lack jurisdiction to abate interest herein.  See Commissioner v. McCoy, 484 U.S. 3, 7 (1987); 508 Clinton Street Corp. v. Commissioner, 89 T.C. 352, 354 (1987); Coffield v. Commissioner, T.C. Memo. 1996-365.

To reflect the foregoing,

Decisions will be entered for respondent as to the deficiency and the additions to tax under sec. 6653(a), and for petitioners as to the addition to tax under sec. 6661.