Albert J. HENRY, Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

**Mary Henry, Petitioner–Appellant,**

v.

**Commissioner of Internal Revenue, Respondent–Appellee.**

Nos. 97–70485, 97–70486.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1999.

Decided March 23, 1999.

Charles F. Gibbs, Chadbourne & Parke, New York, New York, for the petitioners-appellants.

Edward T. Perelmuter and Charles Bricken, United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

Before: LAY,[1] GOODWIN and SCHROEDER, Circuit Judges.

1. Honorable Donald P. Lay, Senior Circuit Judge    for the Eighth Circuit, sitting by designation.

LAY, Circuit Judge:

Petitioners Albert J. Henry and Mary Henry appeal from a decision of the Tax Court upholding an addition of $104,976.70 to their tax deficiency under former section 6653(a) of the Internal Revenue Code for negligent disregard of tax rules and regulations.[2] The parties had stipulated they would be bound by the Tax Court's earlier decision in *Cramer v. Commissioner*, 101 T.C. 225, 1993 WL 369030 (1993), *aff'd*, 64 F.3d 1406 (9th Cir.1995), as to the determination of the underlying income tax deficiency.

The factual background of this appeal is set forth fully in our prior opinion in *Cramer* at 64 F.3d 1406 and in the Tax Court's opinion in the present case. *See Henry v. Commissioner*, 73 T.C.M. (CCH) 1769, 1997 WL 14456 (1997). In focusing on the sole issue in the present case, we only need to highlight those opinions and the relevant governing facts.

## Background

Albert J. Henry was the vice president-finance, chief financial officer and a member of the board of directors of IMED Corporation ("IMED") which provided stock options to him for his services to the corporation. He, along with other officers, filed I.R.C. § 83(b) elections for certain options in which they reported the fair market value of the options as zero. The options were eventually sold to Warner–Lambert Company ("Warner–Lambert") in 1982 and the taxpayers reported long-term capital gain from the sale of these options. In *Cramer*, the Tax Court held that I.R.C. § 83 required the proceeds from these options to be taxable as ordinary income because the options did not have a "readily ascertainable fair market value" as

defined in Treas. Reg. § 1.83–7(b)(2). Therefore, the Tax Court in *Cramer* found that the three IMED officers involved in that case, including Richard Cramer, the president and chief executive officer of IMED, understated their income by long-term capital gain treatment of the sale of their options to Warner–Lambert. The petitioners in this case stipulated that they would be bound by the deficiency finding in *Cramer*. Therefore, this issue is not before us on appeal. However, the petitioners dispute the additions to the tax assessed under I.R.C. § 6653(a) for negligence.

In *Cramer*, three other officers, Cramer, Warren Boynton, the vice president of IMED, and Kevin Monaghan, the outside general counsel and assistant secretary of the board of directors of IMED, were found liable for *intentional* disregard of the rules or regulations and assessed additions to tax under § 6653(a). *See Cramer*, 64 F.3d at 1414–15. The basis of this finding was that these three directors knew that long-term capital gain treatment of the 1982 option sale was contrary to Treas. Reg. § 1.83–7(b)(2) and *chose* to ignore it because they believed there was a valid argument that Treas. Reg. § 1.83–7 was contrary to congressional intent and an invalid interpretation of I.R.C. § 83. *Id.* The Tax Court disagreed with their interpretation of the regulation, as did this court, when Judge Brunetti observed, "This legislative history does not demonstrate that the Reg. § 1.83–7(b)(2) interpretation of § 83 is unreasonable."[3] *Cramer*, 64 F.3d at 1413. We then concluded that the petitioners in *Cramer* chose to play the "audit lottery" and lost. *Id.* at 1415.

The petitioners in this case assert a much different defense to the addition to tax as-

---

**2.** Section 6653(a)(1) imposed an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment "is due to negligence or intentional disregard of rules or regulations." Section 6653(a)(2) provided for a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment "attributable to the negligence or intentional disregard" of the rules or regulations. 26 U.S.C. § 6653(a)(1)-(2) (1982). After numerous amendments, § 6653 was repealed by Pub.L. No. 101–239, Title VII, § 7721, 103 Stat. 2106, 2399–400 (1989).

**3.** This court concluded:

Treasury reasonably concluded that § 83(e)(3) allows restrictions to be considered when determining whether an option has a "readily ascertainable fair market value." Furthermore, Treasury reasonably concluded that certain restrictions, such as those effecting transfer, exercise, and market value, make an option's value not "readily ascertainable," because it is difficult to determine the impact of those restrictions on market value. We therefore reject appellants challenge to Reg. § 1.83–7(b)(2).

*Cramer*, 64 F.3d at 1413.

sessed under I.R.C. § 6653(a). They do not challenge the propriety of the regulation. Rather, their proffered defense is that they did not know nor should have known of Treas. Reg. § 1.83–7(b)(2) and thus did not intentionally choose to ignore its requirements. Petitioners also assert that they acted in good faith and reasonably relied upon the advice of their tax accountant in reporting the proceeds from the sale of the options as long-term capital gain rather than as ordinary income. The Tax Court, however, found that petitioners acted unreasonably and were subject to the addition to tax for their negligence.[4] The petitioners appeal.[5]

In *Cramer,* this court noted the fundamental difference between a finding of negligence and a finding of intentional disregard of the rules and regulations. We relied on the Second Circuit's statement in *Druker v. Commissioner,* 697 F.2d 46, 53–55 (2d Cir.1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983), to determine the relevant inquiry: "The reasonableness of a taxpayer's action may indeed be relevant when he is charged with negligence but not when he admittedly has flouted applicable rules and regulations which he fully understood." *See Cramer,* 64 F.3d at 1414. This state-

ment guides us in our review of the record here. We must review the Tax Court's findings that petitioners' actions were unreasonable and negligent and determine whether these findings are supported by the record.

We review the findings of the Tax Court for clear error. *Id.* The petitioners have the burden to demonstrate that the Tax Court's findings were clearly erroneous. Upon careful review of the record, we hold that petitioners have carried their burden. We find that petitioners did not act negligently by reporting their proceeds from the options as long-term capital gain in contravention of Treas. Reg. § 1.83–7(b)(2).

*Reliance on Certified Public Accountant*

■ The petitioners assert that the Tax Court erred by finding their reliance on their independent certified public accountant, Robert E. Douglas, was unreasonable. They claim that Douglas made the ultimate decision to classify the option proceeds as long-term capital gain and they had no reason to doubt his professional judgment.[6] The Tax Court, however, found the petitioners' reliance on Douglas unreasonable because it found that they had failed to provide Douglas with sufficient information to render an in-

---

4. Although the Commissioner urges that petitioners intentionally disregarded the rules and regulations and asserts that the Tax Court so found, we disregard this argument not only because there is no evidence to support it, but because the Tax Court specifically stated that it found petitioners had acted negligently. Under the clearly erroneous standard, we review the Tax Court's findings and not the arguments of the Commissioner.

On the other extreme is the Tax Court's own misstatement in *Henry* that the *Cramer* court held that the petitioners in that case were negligent. *See Henry,* 73 T.C.M. (CCH) at 1775. In reality, the *Cramer* court found that the petitioners had intentionally disregarded the regulations. *See Cramer,* 64 F.3d at 1414–15.

5. The Tax Court in the present case also found that the substantial understatement addition to tax assessed by the Commissioner under former I.R.C. § 6661 was inapplicable because the petitioners had adequately disclosed the information on their tax return to allow the Commissioner to discover the deficiency. The Commissioner did not file a cross-appeal challenging the Tax Court's ruling on that issue.

6. Petitioners' argument is succinctly set out by the Tax Court:

Petitioners contend that Douglas alone made the decision to classify the option proceeds as long-term capital gain. Petitioners further contend that they had no reason to question Douglas' classification of the option proceeds as long-term capital gain. Petitioners explain that when Douglas was hired as their accountant, Henry was informed that Douglas had an impressive professional background. In addition, petitioners were pleased with Douglas' representation in several audits of prior years. Accordingly, petitioners argue that, at the time Douglas started work on petitioners' joint 1982 Federal income tax return, they had every reason to rely on his professional acumen. *Henry,* 73 T.C.M. (CCH) at 1775.

The Tax Court also found that Douglas had been licensed as a certified public accountant in California since 1977 and was a partner in the firm of Jassoy, Graff & Douglas. He had worked in the tax department of Price Waterhouse between 1968 and 1974 and had served as an instructor in its national tax course. The petitioners chose him as their accountant after he was recommended to them by IMED's treasurer, Dan Hendrickson, as an excellent accountant. Furthermore, the Tax Court found that Douglas had prepared petitioners' 1977 through 1982 joint Federal income tax returns and were satisfied with his performance. *Id.* at 1773.

formed opinion about the proper tax treatment of the option proceeds. Specifically, the Tax Court found that Douglas was not fully informed because petitioners failed to provide Douglas with copies of the 1979 or 1981 IMED options before he prepared their tax returns.

Douglas testified that he alone determined that the option proceeds should be classified as long-term capital gain on petitioners' 1982 tax return. Douglas discussed the various factors he relied upon to reach his decision and the Tax Court accepted them.[7] Nonetheless, the Tax Court found that petitioners were negligent and acted without good faith in relying on Douglas' advice because they did not provide him with sufficient information to reach that conclusion. *See Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir.1988)(holding that taxpayer reliance on accountant was unreasonable where accountant lacked all relevant information). We disagree. As the Tax Court found, Henry provided Douglas with the Form W–2 that he obtained from Warner–Lambert which did not list the option proceeds as compensation income. He informed Douglas that IMED had been sold, and that it was his understanding that Monaghan, IMED's general counsel, had structured the stock options to achieve long-term capital gain. Henry also advised Douglas that if he had any questions regarding the stock option plan he should contact Monaghan or Dan Hendrickson, two of the stock option program managers. Douglas never requested copies of the options and there is no evidence that petitioners knew or should have known that the options themselves were relevant to Douglas' tax treatment of the option proceeds. We deem it reasonable that a taxpayer would not know the relevant information his or her accountant needed to proceed with preparation of tax returns unless the accountant requests such information. Furthermore, contrary to the Tax Court's determination that petitioners did not provide an explana-tion as to why they failed to provide Douglas with the options, the record undisputedly shows that petitioners did not have the options when their tax returns were prepared in 1983 because all options had been delivered to Warner–Lambert when the sale of IMED closed in 1982.

The record also reveals that Douglas did not need the options to make an informed decision about the proper tax treatment. Douglas testified that he was aware that the options contained restrictions and therefore knew there was a possibility that respondent might challenge the classification of Henry's stock option proceeds as long-term capital gain pursuant to Treas. Reg. § 1.83–7(b)(2). However, there is no evidence that Douglas ever told Henry of this risk or of the regulation, and Douglas' knowledge of the risk cannot be imputed to petitioners.

The Tax Court held that "petitioners failed to ask pertinent questions or even make a cursory investigation beyond the information provided to them concerning the IMED stock options." *Henry*, 73 T.C.M. (CCH) at 1776. The Tax Court stated that "petitioners had an obligation to independently verify their own proper income tax liability." *Id.* We find the record shows that petitioners satisfied this obligation. The petitioners consulted their long-time accountant and we find they were reasonable in relying on his preparation of their tax returns. As the Supreme Court has observed:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seek-

---

7. According to the Tax Court, Douglas based his decision on: (1) The fact that no W–2, nor 1099, nor other form or statement had been issued by IMED or Warner–Lambert declaring the option proceeds as compensation income; (2) His belief that IMED's outside auditors had approved long-term capital gain classification; (3) His belief that attorneys representing Warner–Lambert and IMED had structured the sale of the options to accomplish long-term capital gain treatment; and (4) His knowledge of the filing of the 83(b) elections. *See Henry*, 73 T.C.M. (CCH) at 1773. Douglas also gave regard to his understanding that Warner–Lambert would not deduct the amount it paid for the options as an expense on its corporate tax returns.

ing the advice of a presumed expert in the first place. *See Haywood Lumber[ v. Comm'r of Internal Revenue], supra,* [178 F.2d 769] at 771[2d Cir.1959]. "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle,* 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). In conclusion, we find the record does not support the Tax Court's finding that petitioners' reliance on their tax accountant was unreasonable.[8]

*Knowledge of the Regulation*

■ Petitioners contend they acted in good faith because they reasonably believed that long-term capital gain treatment of the option proceeds was appropriate, and they were unaware of Treas. Reg. § 1.83–7(b)(2).[9] The Tax Court rejected their claims of good faith and found that petitioners were aware that the option proceeds were not properly characterized as long-term capital gain. The court stated that, "Henry's involvement at the top level of IMED and in the Warner–Lambert negotiations undermines his plea of ignorance." *Henry,* 73 T.C.M. (CCH) at 1777. We find, however, that the Tax Court's determination is based on pure speculation and conjecture that is not supported by the record.

First, the Tax Court reasons that Henry must have known that long-term capital gain treatment was inappropriate because he was involved in the sale negotiations with Warner–Lambert and knew that tax treatment of the stock options was a critical issue. During these negotiations, Warner–Lambert eventually agreed not to take a deduction for the purchase price of the stock options so that long-term capital gain treatment could be achieved. The Tax Court found that Cramer and Monaghan informed Henry and the other officers after negotiations that the stock option proceeds would be structured as capital gain. Therefore, the Tax Court reasons that Henry should have known that capital gain treatment was questionable and should have made further investigation. We find that the Tax Court's reasoning is a non-sequitur. The fact that the deal was structured to achieve capital gain treatment would, if anything, further support Henry's belief that capital gain treatment was proper.

Second, the Tax Court notes that Hendrickson received a letter from IMED's outside auditor informing him that IMED's position on the tax treatment of the options was subject to challenge by the IRS.[10] The Tax Court then essentially speculates that Henry saw this letter or knew of its contents:

> In this setting, the Stine letter is the only in-depth inquiry concerning the proper taxation of the income from the option

---

**8.** Respondent emphasizes that Henry was a sophisticated businessman as the vice president-finance and chief financial officer of IMED. Henry holds a bachelor of science degree in civil engineering and a masters degree in business administration. The record shows, however, that Henry had no experience with IMED income taxes or with the employee stock option program. IMED's treasurer Dan Hendrickson was responsible for handling IMED's taxes and reported directly to Cramer on tax matters. The record also shows that Henry had not prepared his own tax returns for the preceding fifteen years.

**9.** The Tax Court summarized the reasons petitioners rely upon to support their claim that their belief was reasonable. Along with reliance on their accountant, petitioners contend that their belief was reasonable for the following reasons: (1) Because of IMED's section 83(b) program; (2) the fair market value of the stock options was entered as zero in the election that Henry signed; (3) IMED provided Henry with a letter that stated that the election "is necessary to provide for capital gain treatment upon ulti-

mate stock sale"; (4) Hendrickson informed Henry that the election was necessary to obtain long-term capital gain treatment; (5) Henry was informed that the option proceeds were long-term capital gain by both Cramer and Monaghan; (6) subsequent to IMED's sale, Henry did not possess Forms W–2 or 1099 that reflected the stock option proceeds as income. *Henry,* 73 T.C.M. (CCH) at 1776.

**10.** John Stine of Arthur Young & Co. sent Monaghan and Hendrickson a letter dated October 28, 1981, which stated:

> IMED currently takes the position that its stock options are governed by Section 83 and therefore the present tax treatment is * * * no income to the employee on grant or exercise and no compensation deduction to IMED. However, Regulation 1.83–7 states that an option must have a "readily ascertainable fair market value" before Section 83 will apply. Since the definition of "readily ascertainable fair market value" is virtually impossible to meet, IMED's present position is subject to challenge. * * *

*Henry,* 73 T.C.M. (CCH) at 1772.

proceeds. It appears improbable that the significance of the Stine letter would escape Henry and Hendrickson, especially because it contained an opinion contrary to their hoped-for capital gains reporting of the IMED stock options.

*Henry,* 73 T.C.M. (CCH) at 1777. However, there is absolutely no evidence in the record that Henry saw the letter before he filed his 1982 tax return.[11]

Third, the Tax Court found that the testimony of Hendrickson, Monaghan and Douglas demonstrates that Henry was aware of the risks involved in reporting the option proceeds as long-term capital gain. The record, however, does not support the Tax Court's finding. There is absolutely no evidence in the record that Hendrickson or Douglas told Henry of any risk or of the regulation that was contrary to their position. Hendrickson admitted that he could not remember whether he had told Henry of the risk,[12] and Douglas specifically denied informing him.

The only testimony contained in the record that supports the Tax Court's finding that Henry was aware of the risk of IRS challenge came from Monaghan. Monaghan testified that he told the IMED officers that capital gain treatment was "not bulletproof." The government asserts that this testimony is sufficient in itself to sustain the Tax Court's opinion. However, even if we credit Monaghan's testimony, which Henry denies, this is not evidence that Henry negligently disregarded Treas. Reg. § 1.83–7. Monaghan never testified that he told Henry about Treas. Reg. § 1.83–7 or that long-term capital gain treatment of the option proceeds was contrary to the regulation. He only testified that he told Henry of a risk of IRS challenge. Knowing there is a risk in filing a tax return such that there may be an audit which could result in an income tax deficiency determination, however, does not provide evidence that the taxpayer knew or should have known of the tax regulation and unreasonably disregarded it. Similarly, we could say that all of life is a risk, but certainly one is not negligent for going ahead and living it. Section 6653(a), under which the petitioners were assessed their penalty, did not address situations in which a taxpayer knows or should know of a risk of error. This section relates only to taxpayer disregard of a tax rule or regulation, and there is no evidence in this case that petitioners knew that Treas. Reg. § 1.83–7 existed.

Finally, the Tax Court found that Henry's involvement at the top echelon of IMED undermined his claim that he acted in good faith and did not know that long-term capital gain treatment was inappropriate. Specifically, the court surmised that Henry must have known because he met with Cramer on a daily basis and occasionally went to dinner with him. The court also reasoned that because Henry and the other IMED officers possessed significant amounts of IMED stock options, "[t]he potential value and possible tax treatment of the options to the IMED officers was certain to be a prominent topic of conversation." *Henry,* 73 T.C.M. (CCH) at 1777. The Tax Court went on to find:

> We find it difficult to believe that IMED's chief financial officer would not be privy to this and/or be oblivious to the concerns of the other officers, who, along with Henry, ran IMED. Henry may have entered the top echelon of IMED after Cramer and his nucleus of associates, but he was not an "outsider" regarding IMED's daily business operations.
>
> ... Petitioners' claims of good faith are undermined by the totality of the circumstances.

*Id.*

These findings are based entirely on speculation and guilt by association. The Tax Court, without support from the record, is imputing the knowledge that other IMED officers had of the regulation to Henry. We find the inference the Tax Court made from Henry's association with the other IMED officers is clearly erroneous. Cramer himself testified that Henry was the one "outsid-

---

11. We note, as the petitioners do, that the Commissioner does not rely on this finding or argue on appeal that this letter is relevant to Henry's knowledge.

12. The Tax Court also found that although Henry was Hendrickson's direct supervisor, Hendrickson reported directly to Cramer on tax issues. Hendrickson also testified that he had no duty to provide Henry with any personal tax advice.

er" at IMED, and the record does not demonstrate that Henry was ever informed of Treas. Reg. § 1.83–7. Instead, the record reveals that Henry was repeatedly told that the stock option proceeds should be treated as long-term capital gain,[13] and his accountant confirmed this when he prepared petitioners' 1982 tax returns.

In conclusion, we find that petitioners' reliance on their experienced and long-time accountant's tax treatment of the stock option proceeds was reasonable. The Tax Court's opinion fails to provide more than speculative inferences that Henry was aware of Treas. Reg. § 1.83–7 and negligently disregarded it.

Judgment reversed and remanded to the Tax Court with directions to vacate petitioners' liability for additions to tax under former I.R.C. § 6653(a).

REVERSED and REMANDED.

---

13. Indeed, the Tax Court found that (1) Hendrickson told Henry that he needed to sign his 83(b) election form in order to obtain long-term capital gain on his 1979 options; (2) Henry received an IMED letter stating that the 83(b) election was necessary to provide for capital gain treatment; (3) Cramer informed Henry in 1982 that IMED and Warner–Lambert had agreed on long-term capital gain for the options in return for a reduction in the purchase price; (4) While in Henry's presence, Cramer instructed Monaghan to structure the transaction to produce long-term capital gain; and (5) Monaghan told Henry in 1982 that he had structured the deal to provide long-term capital gain. *See Henry,* 73 T.C.M. (CCH) at 1771, 1773.